UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA  :

 -v-         :
              S10 10 Cr. 228 (LTS)
DANIEL BONVENTRE,   :
ANNETTE BONGIORNO,   Filed Electronically
JOANN CRUPI,     :
 a/k/a "Jodi,"
JEROME O'HARA, and   :
GEORGE PEREZ,

          :
    Defendants.

          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
CERTAIN MOTIONS *IN LIMINE***


        PREET BHARARA
        United States Attorney
        Southern District of New York
        Attorney for the United States
         of America


MATTHEW L. SCHWARTZ
JOHN T. ZACH
RANDALL W. JACKSON
Assistant U.S. Attorneys
 -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :

   -v-            :

                             S10 10 Cr. 228 (LTS)

DANIEL BONVENTRE,            :
ANNETTE BONGIORNO,
JOANN CRUPI,            :
    a/k/a "Jodi,"
JEROME O'HARA, and            :
GEORGE PEREZ,

                             :

           Defendants.

                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF CERTAIN MOTIONS *IN LIMINE*

The United States of America, by and through its attorney Preet Bharara,

United States Attorney for the Southern District of New York, respectfully submits

this memorandum of law in support of its motion for certain rulings in advance of

trial.

**I.      THE GOVERNMENT INTENDS TO OFFER CERTAIN EVIDENCE – INCLUDING O'HARA AND PEREZ'S PAST TAX EVASION, AND CRUPI'S ROLE AS A POTENTIAL VICTIM OF A SEPARATE FRAUD – AS DIRECT EVIDENCE AND/OR PURSUANT TO RULE 404(B).**

The Government seeks permission to introduce at trial certain evidence that

may be construed as "other acts" evidence.   As discussed below, all of this evidence

is admissible because it is necessary background evidence and/or is inextricably

intertwined with the evidence regarding the charged offenses.  In addition, or

1

alternatively, the evidence discussed below is admissible as proof of the relevant defendant's intent, knowledge, and/or absence of mistake with respect to the charges in the Indictment.

### A.     The Proffered Evidence

Set forth below is a list of the other acts that the Government may seek to prove at trial:

### 1.     Jerome O'Hara and George Perez's Tax Fraud

As alleged in the present indictment,[1] Daniel Bonventre, Annette Bongiorno, and Joann Crupi, a/k/a "Jodi," each profited through their participation in the fraud at Madoff Securities, and each of them failed to report the full extent of their ill-gotten gains on their personal income taxes.  For example, Bonventre benefited from hundreds of thousands of dollars in direct payments from the Ponzi Account to pay his son's tuition, Bonventre's coop charges, and his personal American Express card.  Crupi benefited by using the Madoff Securities corporate American Express card for hundreds of thousands of dollars in personal expenses.  And Bongiorno took almost a million dollars in cash out of two "BLM Special" accounts.  As a result of this and related conduct, Bonventre, Bongiorno, and Crupi have each been charged in the present indictment with a variety of tax offenses.

---

[1]     References to the "Indictment" in this memorandum refer to the S10 indictment in the above-captioned case.  Capitalized terms, such as "Madoff Securities" and "Ponzi Account," have the same meaning as in the indictment, unless otherwise defined.

2

But Jerome O'Hara and George Perez also profited from their participation in the fraud at Madoff Securities, and likewise failed to report that income on their taxes.  In particular, and as described in the indictment, O'Hara and Perez were each credited with over $100,000 in their investment advisory accounts in October 2004 – at the time of the SEC and the European accounting firm's first audits of Madoff Securities, as well as a tax audit of Bernard Madoff personally.  *See* Ind. ¶ 41 ($116,950 to O'Hara; $108,530 to Perez).  In April 2006 – just after O'Hara and Perez deleted hundreds of programs from Madoff Securities' computers, and just before they confronted Madoff and Frank DiPascali and ultimately demanded raises and bonuses to continue working at Madoff Securities – O'Hara and Perez both closed their investment advisory accounts and withdrew all of the funds they purported to contain.  Although they appear to have ultimately paid capital gains taxes on the "profits" in their accounts, neither O'Hara nor Perez ever reported or paid taxes on the original funds that Madoff had credited them with in 2004 – not in 2004, when they were credited with the funds, and not in 2006, when they withdrew them.  Nor was that money ever reported as salary or bonus for O'Hara or Perez, and so it never appeared on their W-2s.  *See* Ind. ¶¶ 41-43 & nn. 1 & 2.  Thus, like their co-defendants, O'Hara and Perez failed to report and pay taxes on significant funds from Madoff Securities.

3

**2.**     **Jodi Crupi's Involvement – as a Potential Victim -- in Another Potentially Fraudulent Scheme**

Although not a prior "bad" act, the Government also intends to introduce limited evidence that Crupi and her partner invested in a series of oil and gas exploration companies.  When those investments went sour in 2007, and Crupi and her fellow investors were unable to get complete information from the proponent of the investment, Crupi began to wonder whether the investment was legitimate.  For example, in an e-mail written from Crupi's personal account, she asked, "How much of what [the investment's proponent] says is believable?  His record indicates that he tells people EXACTLY what they want to hear." In another e-mail written several days earlier, Crupi suggests ways in which she and her fellow investors could confirm they had been defrauded:

> Do you have any idea where any of the original documentation is or how we can get our hands on it without it coming from them?
>
> Do we have any access to bank accounts directly involved with this investment?
>
> Do we have contact with any of the vendors associated with supplying equipment or employees?  If so can we get copied on back invoices?

Crupi then counseled that the investors should not appear overly emotional:  "they are not going to respond to your emotional responses the way you want.  I am sure they expected your reaction.  They are incapable of caring how their actions are affecting other people."

**B.    Applicable Law**

Under Federal Rule of Evidence 404(b), the Government may introduce evidence of an uncharged "crime, wrong, or other act" so long as the purpose of the evidence is not "to prove [the defendant's] character in order to show that on a particular occasion the person acted in accordance with the character."  Indeed, such "other acts" evidence is admissible under Rule 404(b) for *any* other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

But Rule 404(b) is not implicated where the "other acts" evidence constitutes direct proof of charged criminal conduct, or if it is inextricably linked with the charged conduct.  As the Second Circuit has explained:

> [E]vidence of uncharged criminal conduct is not evidence of "other crimes, wrongs, or acts" under Rule 404(b) if that conduct is "inextricably intertwined with the evidence regarding the charged offense." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir.1989).  In such circumstances, the uncharged crime evidence is necessary to "complete the story of the crime on trial," *id.*, and, thus, appropriately treated as "part of the very act charged," or, at least, proof of that act, *United States v. Concepcion*, 983 F.2d [369, 392 (2d Cir. 1992)].

*United States* v. *Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *see also United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) ("evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is

5

necessary to complete the story of the crime on trial" (internal alterations and quotation marks omitted)); *Towne*, 870 F.2d at 886 (same); *Weinstein's Federal Evidence*, § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").

Where, however, Rule 404(b) is implicated, it is well settled that "other acts" evidence is admissible so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) ("Other-crime evidence is admissible for any other relevant purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the probative value of this relevant purpose is not substantially outweighed by any unfair prejudice" (internal quotation marks and citations omitted)); *see also United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").   If requested, such evidence must be admitted with limiting instructions to the jury.  *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).

The Second Circuit takes an "'inclusionary" approach to the admission of prior-act evidence, under which "evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *Paulino*, 445 F.3d at 221 (quoting *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)). Pursuant to Rule 404(b), "other acts evidence" is admissible to prove, among other things motive, intent, knowledge, opportunity, preparation, plan, and absence of mistake or accident. *See* Fed. R. Evid. 404(b); *see also United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (providing that proof of state of mind, such as intent, is a "proper purpose" for admission of other crimes evidence under Rule 404(b) (quoting *Huddleston v. United States*, 485 U.S. at 691)); *see also United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) ("[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See United States* v. *Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003).

Regardless of whether the evidence is admitted as direct evidence or under Rule 404(b), "other acts" evidence is, like all evidence, inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, waste of
time, or needless presentation of cumulative evidence.

Evidence is unfairly prejudicial "only when it tends to have some adverse effect
upon a defendant beyond tending to prove the fact or issue that justified its
admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.
1980). Other crimes evidence is not unfairly prejudicial where it is not "any more
sensational or disturbing than the crimes" with which the defendant has been
charged. *United States v. Roldan-Zapata*, 916 F.2d at 804; *see also United States v.
Smith*, 727 F.2d 214, 220 (2d Cir. 1984) (essential inquiry under Rule 403 for
admission of other crimes evidence is whether it involves "conduct likely to arouse
irrational passions").

C. **Discussion**

1. **Evidence of O'Hara and Perez's Tax Frauds is Properly
Admissible at Trial**

O'Hara and Perez's tax frauds are part of the "same transaction or series of
transactions as the charged offense[s]," *Carboni*, 204 F.3d at 44, and so are
admissible as direct evidence of the crimes charged in the Indictment.  Indeed, in
denying the other defendants' motions to sever the tax charges against them, this
Court observed that "[t]rying them [*i.e.*, the tax and non-tax charges] together will
permit the jury to see the 'full picture' of [Madoff Securities]'s illegal operations and
the Defendants' involvement in the same."  May 28, 2013 Opinion at 10 (quoting
*United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991)).

8

O'Hara and Perez's tax frauds – their failure to report and pay taxes on disguised payments that rewarded them for their assistance in getting Madoff Securities through its first audits by the SEC and the European accounting firm – are part of the same course of conduct as the charged offenses, and are at the very least "inextricably intertwined" with them.  As such, this evidence is properly admissible without reference to Rule 404(b).

In any event, evidence of O'Hara and Perez's tax frauds is also admissible pursuant to Rule 404(b) to prove that each of them had the necessary knowledge and intent to commit the offenses charged in the Indictment, and to establish the absence of mistake or inadvertence in their commission of the crimes.

Courts in the Second Circuit have uniformly held that where a defendant claims that his participation in a criminal transaction is innocent, evidence of other similar acts is admissible to demonstrate intent and knowledge.  *See, e.g., Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged").  And a defendant's knowledge and intent is in issue unless the defendant has unequivocally conceded that element of the offense.  *See, e.g., United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (holding that when the defendant "disavows awareness that a crime was being perpetrated" and the government bears the burden of

providing knowledge "as an element of the crime, knowledge is properly put in issue").

In determining the admissibility of evidence to prove knowledge or intent, "[t]he government must identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act." *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002); *see also Paulino*, 445 F.3d at 221-22 (providing that evidence of prior conviction may be admitted under Rule 404(b) to show that defendant had the requisite knowledge or intent to commit charged crime, or to rebut defendant's assertion that he was not person who committed crime, so long as there is similarity or connection between prior and charged conduct).[2]

In the fraud context, the Second Circuit has affirmed the admission of evidence of a defendant's "previous participation in a substantially similar scheme" where the defendant denied having knowledge or fraudulent intent.  For example, in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), the defendant was charged with securities fraud and conspiracy to commit securities fraud, commercial bribery, and wire fraud in connection with the sale of stock in a start-up internet gaming company.  Specifically, brokers working for the defendant used high pressure sales pitches to induce customers to buy the stock, including lying to

---

[2]     This evidence is properly presented in the Government's case-in-chief, rather than in rebuttal.  *See Pitre*, 960 F.2d at 1120 ("as a general rule, the offer of evidence to prove the defendant's intent or knowledge should await the conclusion of the defendant's case.  However, where it is apparent that intent will be in

prospective customers.  *See id.* at 173.  The defendant's defense at trial was that he

neither knew nor approved of the charged fraud.  *See id.* at 177.  At trial, the

District Court admitted evidence of a subsequent scheme in which the defendant

expressed a desire to push up the stock price of a company that he owned.  The

Second Circuit upheld the admission of the evidence, noting the similarities

between the charged scheme and the subsequent scheme and explaining that the

defendant's "demonstrated understanding" of how the subsequent scheme would

work showed that he was "conversant in the language of stock manipulation," thus

making it more likely that he understood what was going on in the charged scheme.

*Id.*

Similarly, in *United States v. Downing*, 297 F.3d 52 (2d Cir. 2002), where the

defendant was charged in a "pump-and-dump" securities fraud scheme, the Second

Circuit upheld the admission of evidence that the defendant had prepared false

audit reports to facilitate a separate securities fraud scheme.  *See id.* at 59.  In

support of its conclusion, the court noted that, at trial, the defendant contended that

he neither knew about nor intended to facilitate any securities or wire fraud by

producing false audit reports.  Thus, the court reasoned, evidence that the

defendant had previously prepared false audit reports to facilitate a securities fraud

scheme, "tend[ed] strongly to belie his assertion that he did not understand the

nature of the scheme for which he was being prosecuted."  *Id.  See also United

States v. Myerson*, 18 F.3d 153, 166-67 (2d Cir. 1994) (upholding admission of prior

─────────────────────────

dispute, evidence of prior or similar acts may be introduced during the

instances of fraudulent diversion of client funds and tax evasion in order to prove

intent to divert client funds and tax evasion at trial).

In particular, evidence of a defendant's participation in other, similar frauds

is routinely admissible pursuant to Rule 404(b) to show knowledge and intent in a

fraud case.  As the Second Circuit explained in *United States v. Klein*, 340 F.2d 547

(2d Cir. 1965):

> The rule which permits the introduction of evidence respecting
> similar offenses for this limited purpose is based on the sound
> recognition that when there exists a pattern of
> misrepresentations, closely related in time and subject matter, it
> is reasonable to believe that they were not made innocently.

*Id.* at 549.

Here, O'Hara and Perez's prior tax frauds were not only similar to the frauds

charged in the Indictment – insofar as they evinced a clear willingness to lie to

regulators and auditors to disguise ill-gotten gains – but was part and parcel of the

same course of conduct.  Indeed, courts routinely permit evidence that a defendant

failed to pay taxes on the proceeds of a charged fraud – either as direct evidence of

the charged crimes, *see, e.g., United States v. Epstein*, 426 F.3d 431, 439 (1st Cir.

2005) (defendant's tax return was "intertwined with the [charged] crime [of mail

fraud] because the tax return reports income that he received from the fraudulent

scheme.  Further, the fact that [the defendant] did not include all of his income

suggests that he had knowledge of the fraudulent scheme."); *United States v.

Johnson*, 262 F.R.D. 410, 416 (D. Del. 2009) ("an alleged pattern of concealing

---

government's case-in-chief").

income, demonstrated by the tax return evidence . . . serves as direct proof that Defendants possessed the requisite fraudulent intent for the crimes charged"), or under Rule 404(b), *see United States v. Osarenkhoe*, 439 Fed. Appx. 66 (2d Cir. 2011) (table) (affirming admission of evidence of defendant's failure to disclose adoption subsidies on income tax return as evidence of her awareness that receipt of the subsidies was fraudulent); *United States v. Pless*, 79 F.3d 1217 (D.C. Cir. 1996) (defendant's failure to pay personal and corporate income taxes during check kiting scheme indicated intent to defraud bank); *United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) ("If, as Defendants claim, they were legally entitled to all the compensation they received . . . they would have reported this compensation as income to the IRS.  The fact that they did not demonstrates . . . consciousness of guilt.").

Thus here, where the Government anticipates that O'Hara and Perez will argue, at least in part, that they were unaware of the purposes to which Madoff and others were putting their work, evidence demonstrating that O'Hara and Perez concealed certain income from Madoff Securities is highly probative of their intent and lack of mistake.  (The evidence of O'Hara and Perez's intent to conceal illicit income from Madoff Securities is not solely limited to the 2004 bonus payments, moreover.  O'Hara and Perez demanded and received raises and bonuses in 2006, as well.  Although those bonuses were not outlandish – even though O'Hara and Perez concededly understood by that point that, at the very least, they were being asked to help Madoff defraud the SEC and others – the Government expects the evidence

adduced at trial to show that they originally asked for much larger bonuses to be paid in gems or precious metals, so as not to leave a "paper trail.")

Indeed, evidence of O'Hara and Perez's tax frauds belies any assertion that either one of them did not know or understand what was going on in the charged offenses.  *See also, e.g.*, *United States v. Smith*, 727 F.2d at 220 (finding similar act evidence of prior frauds "directly relevant under Fed. R. Evid. 404(b) as to [the defendant's] knowledge of, and intent to, commit the frauds charged in the indictment"); *United States v. Birrell*, 447 F.2d 1168, 1172 (2d Cir. 1971) (noting that "evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent"). *See generally United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (proponent of Rule 404(b) evidence need only show that the prior act has "substantial relevancy" to the charged offense).

### 2. The Probative Value of the Tax Fraud Evidence Outweighs Any Prejudice

This tax fraud evidence is highly probative, and not remotely so prejudicial that it should be excluded under Rule 403.  As discussed above, the evidence of O'Hara and Perez's tax frauds is highly probative of their knowledge, intent, and absence of mistake with respect to the charged offenses precisely because they were concealing the fruits of the charged offenses.  Thus, there is little chance that testimony about the prior frauds will elicit a stronger emotional response then evidence of the charged frauds. *See generally Paulino*, 445 F.3d at 223 (upholding admission of prior conviction where conviction "did not involve conduct more

14

inflammatory than the charged crime" (internal quotation marks omitted)); *see, e.g.,* *United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) (probative value of testimony regarding defendant's preparation of false tax return outweighed potential for prejudice when limited instruction given).  Indeed, if anything, the introduction of tax fraud evidence against O'Hara and Perez will actually *avoid* "confusing the issues" or "misleading the jury" where Bonventre, Bongiorno, and Crupi are all charged with similar tax frauds.  Excluding the O'Hara and Perez tax frauds evidence would risk creating the incorrect impression that they had disclosed their illicit income, or otherwise acted differently than their co-defendants.[3]

### 3.   Evidence that Crupi Asked All the Right Questions About a Potential Fraud is Also Properly Admissible

Applying the same standards, evidence that Crupi asked all the right questions when she was a potential fraud victim is admissible to show her knowledge, intent, and lack of mistake.   Like O'Hara and Perez, the Government anticipates that Crupi will argue that she did not understand the significance of her day-to-day work at Madoff Securities, which consisted primarily of (a) creating documentation reflecting fake, historical securities trades for certain investment advisory clients; and (b) keeping track of the cash coming in to and out of the Ponzi Account – none of which ever went to, for example, securities counter-parties or prime brokers.   Indeed, as discussed further in the final section of this

---

[3]     Permitting this evidence will also not noticeably prolong or complicate the trial.  Indeed, because the underlying payments to O'Hara and Perez are part of the charged crimes, the only additional evidence that would need to be admitted to prove their tax fraud is their tax returns.

memorandum, Crupi has already admitted that this was the daily sum of her work at Madoff Securities.

In her own investments, Crupi's correspondence demonstrates that she understood precisely what questions to ask and what steps were important to unmask a potential fraud – first and foremost among them being the need to get documentation such as bank records and invoices directly from third parties.  Crupi understood that the critical question was "how we can get our hands on [this documentation] without it coming from them," *i.e.*, the potential fraudster.  Of course, Crupi understood the importance of independent verification because she had just spent much of the past three years helping to create fake documents to show a parade of auditors – from the SEC, the European accounting firm, and taxing authorities – so that the fraud at Madoff Securities could remain undetected.  This evidence is therefore directly admissible to show Crupi's knowledge, intent, and lack of mistake.  There is also no credible argument that this evidence should be excluded under Rule 403, since evidence that Crupi was a potential fraud *victim* is not prejudicial at all.  Nor will the evidence prolong or further complicate the trial, as the Government proposes to admit only a handful of particularly relevant e-mails.

## II.  EVIDENCE THAT VARIOUS DEFENDANTS, WITNESSES, AND OTHER CO-CONSPIRATORS WERE INVOLVED IN ROMANTIC RELATIONSHIPS SHOULD BE EXCLUDED

Unlike the "other act" evidence the Government seeks permission to introduce at trial, the Court should exclude as unduly prejudicial evidence that

various Madoff Securities employees – including all but one of the defendants, several Government witnesses, and Bernard Madoff himself – were at various times in romantic and/or sexual relationships with one another.

Because of the inflammatory nature of this evidence, we do not catalogue it here, although the Government certainly can at the Court's request. Suffice it to say that the Government's investigation has revealed that, over the course of the multi-decade fraud alleged in the indictment, a number of Madoff Securities employees and customers – including expected witnesses, defendants, and others – were engaged in romantic or sexual relationships. For example, one of the defendants was in a love triangle with Bernard Madoff himself.

This evidence undeniably has some probative value to both the Government, *see, e.g., United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999) (evidence of close personal relationship between co-conspirators relevant because it can demonstrate "how illegal relationships and mutual trust developed"), and arguably to the defense, *see, e.g., United States v. Nuccio*, 373 F.2d 168 (2d Cir. 1967) (holding district court should have permitted cross-examination of government witness about sexual advances that he made toward the defendant); *but see United States v. Griffith*, 284 F.3d 338 (2d Cir. 2002) (no abuse of discretion where district court limited cross-examination of victim about her "relationships with men . . . her drug use, and her sexual history" because "these subjects would not have been relevant" to her credibility). Nonetheless, the Government seeks an order excluding any such evidence – by either side, either as direct evidence or to impeach – pursuant to Rule

17

403.  The Government seeks this ruling *in limine* only to ensure that witnesses are appropriately prepared and, should the Court find evidence of past romantic or sexual relationships admissible, so that this evidence can be elicited during the Government's case-in-chief.

## III.  BONGIORNO AND CRUPI SHOULD BE HELD TO THE TERMS OF THEIR PROFFER AGREEMENTS

In early 2009, before either one of them had been arrested, both Annette Bongiorno and Joann Crupi separately met with Assistant United States Attorneys and other Government agents (the "Meetings").  At the Meetings, the defendants were represented by counsel.  Before each of the Meetings, the defendant and her attorney executed an agreement, which has for many years been the standard-form proffer agreement in the Southern District of New York.  In the agreements (which were identical), the defendants and the Government agreed, among other things, that each defendant's statements at the Meetings could be used against her in a number of circumstances.  For example, under the agreement, "the Government may use statements made by [the defendant] at the meeting . . . for the purpose of cross-examination should [the defendant] testify" and "the Government may also use statements made by [the defendant] at the meeting to rebut any evidence or arguments offered by or on behalf of [the defendant]" at a criminal trial.

After executing their respective agreements, both Bongiorno and Crupi spoke to the Government at length.  In short, both Bongiorno and Crupi acknowledged creating client account statements for historical securities transactions – that is, each one admitted that she created "trades" that had purportedly occurred before

they were entered into Madoff Securities' systems.  Both women also explained that Madoff had promised certain clients guaranteed "benchmark" returns every year, and if those accounts were in danger of failing to achieve their benchmark, Bongiorno or Crupi would "execute" additional fake trades in order to hit the promised return.  Bongiorno explained that she believed (for unspecified reasons) that this practice was acceptable so long as the fake trades were all "executed" in the then-current calendar month.  For her part, Crupi explained that she believed that the investment advisory trades were executed in either the market-making operation or in Europe, and that the work of the investment advisory business amounted to mere internal record-keeping.  Bongiorno and Crupi also both acknowledged, at various times, having primary responsibility for maintaining a running tally of deposits into and withdrawals from the bank account through which Madoff's investment advisory business (and therefore, his Ponzi scheme) was run.  Both women admitted, among other things, that there were no payments to or from securities counter-parties or prime brokers in the account's activity that would have suggested client money was being used to purchase securities.

Any defense that Crupi or Bongiorno lacked the requisite mental state to commit the charged crimes is therefore inconsistent with their statements at the Meetings.   Putting aside whether the two actually believed that creating retrospective trade confirmations was legitimate, even taken at face value their statements at the Meetings establishes their knowing and willful participation in a conspiracy to defraud.  For example, even assuming Bongiorno believed that she

could back-date trades within any given month, by her own admission she could not legitimately back-date a trade by more than a decade. *See, e.g.,* Ind. ¶ 35 (describing "trade" backdated by Bongiorno in Daniel Bonventre's account by twelve years); Ind. ¶¶ 31-32 (describing project in which Bongiorno "amended" six months' worth of statements to help a pension plan pass a Department of Labor audit). And Crupi's admission that she realized that client funds were not being used to purchase securities (as promised, and as reflected on the trade confirmations she generated) is dispositive of her intent to commit securities fraud, even if Crupi actually believed, as she claimed, that Madoff had some "other" assets (such as real estate) that could be used to pay back clients. This is particularly so in the last few days of Madoff Securities, after Frank DiPascali explicitly told Crupi that the Ponzi scheme was collapsing (a conversation that Crupi corroborated, albeit not in so many words), when Crupi continued to accept almost $50 million in new client funds and paid out hundreds of millions more.

In these circumstances, and for the reasons set forth below, the Government respectfully seeks an *in limine* ruling permitting the jury to hear the statements made by the defendants at the Meetings should defense counsel press certain arguments, and certainly should they testify. Proffer agreements between the Government and a defendant are construed in light of general principles of contract law. *See, e.g., United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998). As in the case of a contract between private parties, a proffer agreement that is unambiguous on its face is to be enforced in accord with its plain terms. *See, e.g.,*

*United States v. Weaver*, 905 F.2d 1466, 1472 (11th Cir. 1990) (collecting cases). Whether a proffer agreement is ambiguous is determined by the Court as a matter of law. *See, e.g., id.* (quoting *United States v. Howard*, 791 F.2d 294, 300 (4th Cir. 1986)).  Here, as noted above, the Agreement stipulates that "the Government may use statements by [the defendant] . . . for the purpose of cross-examination should [the defendant] testify" and "the Government may . . . use statements made by [the defendant] at the meeting to rebut any evidence or arguments offered by or on behalf of [the defendant]" at a criminal trial.  This clause is simple, straightforward, and wholly non-technical.  There is nothing ambiguous about it.  *See United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005) (holding that closely similar language in a proffer agreement "unambiguously" expresses the parties' intent).  Accordingly, these provisions of the Agreement should be enforced as written.  *See Weaver*, 905 F.2d at 1472; *cf.* Proffer Agreement at 2 (indicating in each case, that the defendant and his or her attorney discussed and understood each clause of the agreement).

On its face, the quoted provisions of the proffer agreement permit the Government to introduce the statements the defendants made at the Meetings based on certain "arguments" pressed by defense counsel at trial.  There is no limitation in the agreement on how such triggering "arguments" might be made — through defense counsel's opening argument, cross-examination, or in any other way.  Indeed, with respect to a closely similar proffer agreement, the Second Circuit has held that "[f]actual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within th[e] broad language" of the

proffer agreement.  *See Barrow*, 400 F.3d at 118 (emphasis added).  Furthermore, under the terms of the Agreement, the "arguments" of defense counsel that, once made, permit the Government to introduce the defendant's proffer statements are those that can be "rebut[ted]" by the statements made by the defendant at the meeting.  The meaning of "rebut[ted]" in this context is not ambiguous, and has been explicated by the Second Circuit:

> "[R]ebuttal" is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary. . . . Accordingly, we reject [the defendant's] argument that the district court was obliged to construe his waiver to apply only to proffer statements that directly contradicted his counsel's factual assertions. Once defense counsel's factual assertions in opening and cross-examination triggered the proffer agreement's waiver of Rule 410, the district court enjoyed the same broad discretion to admit [the defendant's] proffer statements that it would have with respect to any other rebuttal evidence.

*Barrow*, 400 F.3d at 121.  The Second Circuit's interpretation of the term "rebut[tal]" is persuasive, as it accords with — and, indeed, is based entirely upon — the plain meaning of the term.

For the reasons set forth above, the Government respectfully seeks an *in limine* ruling permitting the jury to hear the statements made by the defendants at the Meetings should that defendant testify and/or should either defendant's statements at the Meetings "fairly counter[] and cast[] doubt on the truthfulness of" any arguments made by their counsel (through cross-examination, opening argument, or otherwise).  *Barrow*, 400 F.3d at 121.  Moreover, to the extent that

22

either defendant is committed to such a defense such that they anticipate raising it in their own opening statements, the Government respectfully requests to reference that defendant's proffer statements in its opening remarks to the jury.

## CONCLUSION

For all of the foregoing reasons, the Government's pre-trial motions should be granted.

Dated:      New York, New York
            August 8, 2013

                              PREET BHARARA
                              United States Attorney

                    By:     _____/s/_____
                              MATTHEW L. SCHWARTZ
                              JOHN T. ZACH
                              RANDALL W. JACKSON
                              Assistant United States Attorneys
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Telephone:  (212) 637-1945 / 2410 / 1029
                              Facsimile:  (212) 637-2452
                              E-mail:     matthew.schwartz@usdoj.gov
                                          john.zach@usdoj.gov
                                          randall.jackson@usdoj.gov