UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :   DECLARATION OF SPECIAL AGENT
UNITED STATES OF AMERICA            :   PAUL F. ROBERTS, JR. IN
                                        SUPPORT OF PRELIMINARY ORDER
                                    :   OF FORFEITURE AS TO SPECIFIC
        -v.-                            PROPERTY/MONEY JUDGMENT
                                    :
DANIEL BONVENTRE,
                                    :
            Defendant.              :   S10 10 CR. 228 (LTS)
                                    :
------------------------------------x

STATE OF NEW YORK           )
COUNTY OF NEW YORK          : ss
SOUTHERN DISTRICT OF NEW YORK )

        PAUL F. ROBERTS, JR., under penalty of perjury, declares:

        1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI").   I am assigned to a squad that investigates
securities fraud and corporate fraud offenses.   I have been assigned
to that squad for approximately five years.   I have been personally
involved in the investigation of the above-captioned case since
approximately April of 2009.

        2.    I respectfully make this declaration in connection
with the Government's application for a Preliminary Order of
Forfeiture as to Specific Property/Money Judgment ("Forfeiture
Order") arising out of the conviction of the defendant, DANIEL
BONVENTRE, at trial of several offenses giving rise to forfeiture.
From my review of the case file and participation in the
investigation, I am familiar with the facts and circumstances of this
forfeiture case.   Because this declaration is being submitted for

a limited purpose, I have not included in it everything I know about this forfeiture case.  Where the contents of documents and the actions, conversations, or statements of others are related herein, they are related in substance and in part.

THE CRIMINAL CONVICTION AND THE CIVIL FORFEITURE CASE

3.    On or about July 29, 2013, DANIEL BONVENTRE, among others, was charged in a thirty-three-count Superseding Indictment, S10 10 CR. 228 (LTS) (the "Indictment"), with, among other offenses, conspiracy to defraud Madoff Securities investment advisory clients, in violation 18 U.S.C. § 371 (Count One); conspiracy to commit securities fraud and to falsify books and records relating to audits of Madoff securities, in violation of 18 U.S.C. § 371 (Count Two); conspiracy to commit accounting fraud and defraud banks, in violation of 18 U.S.C. § 371 (Count Three); conspiracy to commit tax fraud, in violation of 18 U.S.C. § 371 (Count Four); three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.240.10b-5; 18 U.S.C. § 2 (Counts Six through Eight); three counts of falsifying records of a broker dealer in violation of 15 U.S.C. §§ 78q(a) and 78ff; 17 C.F.R. §§ 240.17a-3; 18 U.S.C. § 2 (Counts Nine through Eleven); three counts of falsifying records of an investment adviser in violation of 15 U.S.C. §§ 80b-4 and 80b-17; 17 C.F.R. §§ 275.204-2; and 18 U.S.C. § 2 (Counts Twelve through Fourteen); false filing with the SEC, in violation of 15

2

U.S.C. §§ 78q(a) and 78ff; 17 C.F.R. § 240.17a-5, and 18 U.S.C. § 2
(Count Fifteen); bank fraud in violation of 18 U.S.C. §§ 1344 and
2 (Count Eighteen); four counts of subscribing to false U.S.
individual income tax returns in violation of 26 U.S.C. § 7206(1)
(Counts Twenty through Twenty-Three); and obstructing and impeding
the due administration of the internal revenue laws, in violation
of 26 U.S.C. § 7212(a) (Count Twenty-Four).

       4.    The Indictment included a forfeiture allegation,
seeking forfeiture to the United States, pursuant to 18 U.S.C. §
981(a)(1)(C) and 28 U.S.C. § 2461, of all property, real and personal,
that constitutes or is derived, directly or indirectly, from proceeds
traceable to the commission of the offenses charged in Counts One
through Three and Six through Eleven of the Indictment, including,
but not limited to, a sum of money representing the amount of proceeds
obtained as a result of the said offenses, to wit, approximately $170
billion, and all property traceable thereto, for which the defendants
are jointly and severally liable; and a forfeiture allegation seeking
forfeiture to the United States, pursuant to 18 U.S.C. § 982, of all
property constituting or derived from proceeds obtained directly or
indirectly as a result of the offenses charged in Counts Three and
Eighteen of the Indictment, and all property traceable to such
property, including but not limited to a sum of money representing
the amount of proceeds obtained as a result of the said offenses,

to wit, approximately $487 million, and all property traceable
thereto.

     5.    On or about March 24, 2014, the jury returned a guilty
verdict against BONVENTRE as to Counts One through Four, Six through
Eleven, Fifteen, Eighteen, Twenty through Twenty-Three, and
Twenty-Four of the Indictment.

     6.    In addition to the above-captioned criminal case, the
United States brought a civil forfeiture action, *United States v.
All Funds on Deposit in Account Nos. 94660869, 9948199297, 80007487,
9115606297, 9116151903, and 9931127481 in the Names of Annette
Bongiorno and/or Rudy Bongiorno at Citibank, N.A., et al.*, 10 Civ.
4858 (LAP) (JCF) (S.D.N.Y.) (the "Civil Forfeiture Action"), seeking
forfeiture in rem of certain items of real and personal property
identified in the Second Amended Verified Complaint filed in the
Civil Forfeiture Action on February 2, 2011, 10 Civ. 4858 (LAP) (JCF)
(ECF No. 11).

<u>THE MONEY JUDGMENTS</u>

     7.    The Government's proposed Forfeiture Order includes
a money judgment in the amount of $161,970,388,208 in United States
currency (the "First Money Judgment").  This amount represents
proceeds of the offenses charged in Counts One, Two, and Six through
Eleven, corresponding to a conservative estimate of cash additions
to Bernard L. Madoff Investment Securities ("BLMIS") during the time

period that BONVENTRE participated in the securities and investment advisory fraud and related offenses.

       8.   In the course of this investigation, I have reviewed a draft summary of cash additions and withdrawals as to BLMIS prepared by the Securities Investor Protection Act ("SIPA") trustee for the liquidation of BLMIS, drawn from a review of BLMIS and financial institution records as of June of 2014.  According to the summary, the following cash additions were made in the years from 1981 to 2008:

| Year | Cash Additions (USD) |
|------|----------------------|
| 1981 | 83,245,744 |
| 1982 | 119,854,017 |
| 1983 | 141,280,863 |
| 1984 | 308,284,515 |
| 1985 | 516,532,241 |
| 1986 | 554,817,622 |
| 1987 | 684,560,266 |
| 1988 | 920,659,349 |
| 1989 | 1,049,936,625 |
| 1990 | 1,215,254,636 |
| 1991 | 1,215,961,191 |
| 1992 | 2,036,325,010 |
| 1993 | 2,072,060,764 |
| 1994 | 2,880,980,142 |
| 1995 | 4,457,766,705 |
| 1996 | 6,709,886,440 |
| 1997 | 9,126,422,561 |
| 1998 | 12,897,367,873 |
| 1999 | 17,934,255,213 |
| 2000 | 25,640,110,700 |
| 2001 | 37,455,978,437 |
| 2002 | 3,320,947,044 |
| 2003 | 3,255,865,529 |
| 2004 | 4,045,610,457 |

| | |
|---|---|
| 2005 | 3,617,138,988 |
| 2006 | 5,960,469,014 |
| 2007 | 7,344,189,116 |
| 2008 (through 12/11/2008) | 6,404,627,146 |

9.   The   total   amount   of   these   additions   is $161,970,388,208.

10.   BONVENTRE was a BLMIS employee since 1968, and the evidence at trial established that he had knowledge of the fraud scheme since at least prior to 1981.   For example, Enrica Cotellessa-Pitz testified that approximately six months after she started working for Madoff (in 1978 part-time, Tr. 3642, or 1980 full-time), after she had stated to a bank employee that coupons she was clipping belonged to customers, BONVENTRE instructed Cotellessa-Pitz not to mention the word "customers" to anyone at the bank.   Tr. 3666.

11.   Since BONVENTRE was a BLMIS employee and participant in the fraud schemes since well before 1981, he is accountable for the entire amount of cash additions to BLMIS fraudulently induced as a result of the offenses charged in Counts One, Two, and Six through Eleven during this time period.

12.   The proposed Forfeiture Order also includes a money judgment in the amount of $487,000,000, representing the proceeds of the offenses charged in Counts Three and Eighteen, corresponding to bank loans fraudulently obtained as a result of BONVENTRE's bank

6

fraud offenses.

13.   The amount of these loans is evidenced by several pieces of trial evidence, including Government Exhibits 104-21 and 105-A242 as to the Bank of New York loans and Government Exhibits 105-A46 to 105-A63, 105-A428, and 206-1 to 206-4 as to the J.P. Morgan Chase loans.

## THE SPECIFIC PROPERTY

14.   The proposed Forfeiture Order also identifies the following specific property as subject to forfeiture:

   a.   UP TO AT LEAST $223,975 HELD ON DEPOSIT AT CITIBANK, N.A. ACCOUNT NO. 9982584826, IN THE NAME OF BARBARA G. BONVENTRE (the "Bonventre Citibank Account");

   b.   ALL FUNDS AND OTHER PROPERTY HELD IN CHASE INVESTMENT ACCOUNT NO. CM7 304867, IN THE NAME OF DANIEL AND BARBARA BONVENTRE (the "BONVENTRE Chase Investment Account");

   c.   ALL FUNDS AND OTHER PROPERTY HELD IN JPMORGAN CHASE ACCOUNT NO. 936 0003166746 2, in the name of DANIEL BONVENTRE, Minor, Barbara Bonventre, Custodian Under UTMA (the "Bonventre Chase UTMA Account");

   d.   ALL FUNDS AND OTHER PROPERTY HELD IN FIDELITY INVESTMENTS / FMR LLC ACCOUNT NO. Z72 715786, IN THE NAME OF DANIEL AND BARBARA BONVENTRE (the "BONVENTRE Fidelity Account");

   e.   ANY AND ALL FUNDS HELD ON ACCOUNT FOR DANIEL BONVENTRE IN ANDREW J. FRISCH ATTORNEY TRUST IOLA ACCOUNT NO. 9943361400 AT CITIBANK, N.A. EXCEPT FOR THOSE FUNDS EARNED BUT NOT DRAWN AS OF DECEMBER 21, 2010 (the "Frisch IOLA Account Funds");

   f.   ANY AND ALL FUNDS HELD ON ACCOUNT FOR DANIEL BONVENTRE BY CAPSTONE ADVISORY GROUP LLC, 104 WEST 40th STREET,

16th FLOOR, NEW YORK, NY 10018 EXCEPT FOR THOSE FUNDS EARNED BUT NOT DRAWN AS OF DECEMBER 21, 2010 (the "Capstone Funds");

g.   ALL RIGHT, TITLE AND INTEREST IN NATIONAL INTEGRITY LIFE INSURANCE COMPANY IRA CONTRACT NOS. 1100092154, IN THE NAME OF DANIEL BONVENTRE, AND 1100092160, IN THE NAME OF BARBARA BONVENTRE (the "BONVENTRE National Integrity Retirement Accounts");

h.   ALL RIGHT, TITLE AND INTEREST IN PIONEER INVESTMENTS ACCOUNT NOS. 06204778379, IN THE NAME OF PIM ROLLOVER IRA CUST TRUST FOR DANIEL  BONVENTRE, AND 06204778388, IN THE NAME OF PIM ROLLOVER IRA CUST TRUST FOR BARBARA BONVENTRE (the "BONVENTRE Pioneer Retirement Accounts");

i.   ALL RIGHT, TITLE AND INTEREST IN MFS INVESTMENT MANAGEMENT ACCOUNT NOS. 0013 08186857582, IN THE NAME OF MFS HERITAGE TRUST CO TRUSTEE IRA R/O DANIEL BONVENTRE, AND 0013 08186857586, IN THE NAME OF MFS HERITAGE TRUST CO TRUSTEE IRA R/O BARBARA BONVENTRE (the "BONVENTRE MFS Retirement Accounts");

j.   ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOWN AS 16 EDGEWATER TERRACE, MANTOLOKING, NEW JERSEY 08738 (the "BONVENTRE Edgewater Property");

k.   ALL RIGHT, TITLE AND INTEREST IN ANY AND ALL SHARES OF CAPITAL STOCK OF 79TH STREET EAST OWNERS INC. HELD IN THE NAMES OF DANIEL R. BONVENTRE AND BARBARA G. BONVENTRE AND IN THE PROPRIETARY LEASE BETWEEN DANIEL R. BONVENTRE AND BARBARA G. BONVENTRE AND 79TH STREET EAST OWNERS INC. FOR UNIT 17G AND 17H IN THE BUILDING KNOWN AS 505 EAST 79TH STREET, NEW YORK, NEW YORK 10021, TOGETHER WITH ALL CONTRACT RIGHTS, FIXTURES AND APPURTENANCES ATTACHED TO, PLACED UPON, OR USED IN ANY WAY IN CONNECTION WITH SUCH PROPERTY (the "BONVENTRE 79th Street Coop");

and all property traceable thereto (the "Specific Property").

8

<u>Payments From BLMIS Received by BONVENTRE</u>

15.  Over the course of his lengthy employment at BLMIS, BONVENTRE received a substantial salary, and, in some years, bonuses. In 2008, his salary (and bonus, if applicable) totaled approximately $1,290,292;  in   2007,   approximately   $1,091,876;   in   2006, approximately $900,024; in 2005, also approximately $900,024; in 2004, approximately $713,486; in 2003, approximately $705,409; in 2002, approximately $703,940; in 2001, approximately $600,012; in 2000, approximately $300,006; in 1999, approximately $226,800; in 1998, also approximately $226,800; in 1997, approximately $280,200; in 1996, approximately $226,800; in 1995, approximately $276,800; in 1994, approximately $176,800; in 1993, approximately $176,800; and in 1992—the earliest date for which salary information could be obtained—approximately $132,500.

16.  BONVENTRE maintained an IA account at BLMIS (the "Bonventre IA Account") from at least as early as 1979 through December 2008—although BONVENTRE emptied his IA Account in or about April 2006, and there was no activity in the account after a journal entry dated on or about June 5, 2006.

17.  According to internal BLMIS records, after on or about December 23, 1997, there were no deposits made to the Bonventre IA Account.

18.  According to internal BLMIS records, on or about

April 27, 2000, the BONVENTRE IA Account had a (negative) balance of -$389,016.27 as a result of withdrawals that exceeded deposits. According to internal BLMIS records, on or about April 27, 2000, an "adjustment" was made to the account in the amount of $771,016.27, resulting in a "new balance" of approximately $382,000.00. This adjustment was not tied to any purported deposits, transfers, dividends, stock splits, liquidations, salary, or bonus payments.

19. Approximately one year later, on or about May 29, 2001, a check drawn on the IA Bank Account in the amount of $200,000 was made out to BONVENTRE and his wife. The proceeds of the check were ultimately deposited in an account BONVENTRE and his wife held at Cohmad Securities Corporation. (See discussion of Cohmad Account at paragraphs 62-64, below). The Bonventre IA Account statement dated November 30, 2002 reflects an opening and closing balance of $182,000.

20. Beginning in or about November 2002, and continuing through 2006, at BONVENTRE's request, BONGIORNO created a number of backdated, fictitious trades in the Bonventre IA Account to create false gains of more than approximately $1.8 million. As described below, one series of trades in a particular stock was backdated by approximately twelve years, and produced a purported gain of more than $999,000. Two more series of backdated trades were created in 2004 and 2006 for illicit "profits" of approximately $880,000.

10

(a)   *The November 2002 Fictitious Big Lots "Trade"*

21.   On or about November 12, 2002, Madoff signed a check drawn on the IA Bank Account made out to BONVENTRE and his wife in the amount of approximately $999,375.   That check was thereafter deposited in a joint bank account held by BONVENTRE and his wife which is described in paragraph 44, below.

22.   On or about November 22, 2002, BONGIORNO directed a backdated trade to be entered in the records of the Bonventre IA Account maintained on House 17 that purportedly had taken place in 1990, approximately twelve years earlier.   The false trade created by BONGIORNO had the effect of showing, on paper, purchases of 40,000 shares of common stock of Consolidated Stores on January 31, 1990, for approximately $90,000, and sales of approximately 62,500 shares of common stock of Big Lots Inc. (adjusted for stock splits and the change of Consolidated Stores' corporate name to Big Lots Inc.) on September 26, 2002, for approximately $1,089,375.   These purported purchases and sales of Big Lots Inc. common stock resulted in purported long term gains of approximately $999,375.

23.   The backdated trades in Big Lots were created in order to disguise payments made by BLMIS to BONVENTRE as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long term capital gains (as opposed to the higher tax rate for

ordinary income).

24.   Following the backdated Big Lots "trade," and the withdrawal effected through the November 12, 2002 check in the amount of approximately $999,375 (see paragraph 21, above), the Bonventre IA Account reflected a balance of approximately $182,000

(b)   *The July 2004 Fictitious Lucent "Trade"*

25.   The Bonventre IA Account statements for the period March 2003 through March 2004 reflected no securities positions, and a constant cash balance of approximately $182,000.   In or about April 2004, BONVENTRE and his wife received from BLMIS a check drawn on the IA Account in the amount of approximately $200,000, and the balance in the Bonventre IA Account was reduced by the same amount, leaving a (negative) balance, as of on or about April 30, 2004, of approximately -$18,000.

26.   On or about July 12, 2004, at the direction of BONGIORNO, a series of false, backdated trades were entered in the records of the Bonventre IA Account maintained on House 17.   Those false trades had the effect of showing, on paper:   (a) the purchase of approximately 90,000 shares of common stock of Lucent Technologies Inc. ("Lucent") on March 11, 2003, for a total price of approximately $144,000; (b) the purchase of approximately 67,000 shares of Lucent on March 12, 2003, for a total price of approximately $102,510; (c) the sale of approximately 67,000 shares of Lucent on April 19, 2004,

12

for a total price of approximately $285,420; and (d) the sale of approximately 90,000 shares of Lucent on April 20, 2004, for a total price of approximately $360,900.

27.   The purported purchases and sales of Lucent stock described above, resulted in purported net profits of approximately $399,810.   BONGIORNO documented this transaction on an account statement belonging to BONVENTRE, on which she wrote: "Dan had me put thru a profit trade for 399,810.00 then add that figure to cap additions."   Immediately following the Lucent "transaction," the Bonventre IA Account reflected a balance of approximately $381,000.

28.   The backdated trades in Lucent were created in order to disguise payments made by BLMIS to BONVENTRE as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long term capital gains (as opposed to the higher tax rate for ordinary income).

29.   On or about May 25, 2005, a check drawn on the IA Bank Account in the amount of approximately $400,000 was made out to BONVENTRE and his wife.   Immediately following the withdrawal effected by the $400,000 check, the Bonventre IA Account reflected a (negative) cash balance of approximately -$18,190.

(c)   *The March 2006 Fictitious Apple "Trade"*

30.   During the period between in or about January 2005 through in or about February 2006, the Bonventre IA Account

13

statements reflected no securities positions, and a constant (negative) cash balance of approximately $18,190.00.

31. In or about March 2006, BONVENTRE provided the following handwritten instructions to BONGIORNO:

> Hi Annette
>
> As per our phone conversation, I need a long term capital gain of $449000—on an investment of $129000—for a sale proceed of $578000.
>
> I'll be back in NY on March 30th but if you need to speak to me before then, call me on []
>
> Thanks
> Dan

32. On or about March 31, 2006, BONGIORNO entered a series of purported trades in the records of the Bonventre IA Account. Those false trades had the effect of showing:  (a) the purchase of approximately 8,000 shares of common stock of Apple Computer Inc. ("Apple") on January 25, 2005, for a total price of approximately $577,760; and (b) the sale of approximately 16,000 shares of Apple on March 9, 2006, for total proceeds of approximately $1,056,960.

33. The backdated trades in Apple were created in order to disguise payments made by BLMIS to BONVENTRE as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long term capital gains (as opposed to a higher tax rate for ordinary income).

34. The purported purchases and sales of Apple, described

14

above, resulted in purported net long term gains of approximately $479,200, and immediately following the Apple "transaction," the Bonventre IA Account reflected a balance of approximately $461,010. On or about April 6, 2006, BONVENTRE received a check drawn on the IA Bank Account in the amount of approximately $577,954.81, resulting in a (negative) balance of -$116,944.81. Bonventre's IA account statement reflecting activity through June 30, 2006 shows a journal entry in the amount of approximately $116,944.81, which then brought the account balance to $0. Internal BLMIS records reflect no subsequent activity in the Bonventre IA Account. (See paragraph 16, above).

35. Separate and apart from his salary, bonuses, and profits from false, backdated trades in his IA account, BONVENTRE paid some of his personal expenses out of BLMIS bank accounts and, further, caused checks drawn on BLMIS bank accounts funded by the BLMIS Operating Account to be written to himself and used the proceeds for the personal benefit of himself and his wife.

36. BONVENTRE supervised the use and reconciliation of BLMIS bank accounts, including the BLMIS Operating Account—the account that was principally used to fund BLMIS's operations—and related accounts through which the market making and proprietary trading were funded. BONVENTRE had signature authority for the BLMIS Operating Account and, in addition, supervised the BLMIS

employees who were responsible for accounting.

37.   Between on or about February 10, 2003, and on or about October 29, 2007, BONVENTRE issued or caused to be issued at least six checks payable to himself that were drawn on BLMIS bank accounts funded by the BLMIS Operating Account.   BONVENTRE signed the checks, or caused the checks to be signed, on behalf of BLMIS (the "Bonventre Checks"), as shown below:

| Date | Amount |
|------|--------|
| February 10, 2003 | $33,300.00 |
| November 12, 2003 | $65,000.00 |
| December 21, 2004 | $18,420.24 |
| January 13, 2006 | $61,900.00 |
| January 17, 2007 | $35,000.00 |
| October 29, 2007 | $60,000.00 |
| Total | $273,620.24 |

38.   BONVENTRE endorsed each of the checks and deposited them in one or more of his personal bank accounts.   Neither BONVENTRE nor BLMIS reported any of the approximately $273,620.24 BONVENTRE received through the Bonventre Checks to the Internal Revenue Service as salary, bonus or any other form of income.

39.   In addition, on or about April 12, 2000, BONVENTRE issued or caused to be issued a check in the amount of $50,000 payable to himself that was drawn on a BLMIS bank account funded by the BLMIS Operating Account.   BONVENTRE signed the check, or caused the check to be signed, on behalf of BLMIS.   BONVENTRE endorsed the check and

16

deposited it in one of his personal bank accounts.

40.  Moreover, according to internal BLMIS records, beginning at least as early as in or about 1993 through at least in or about 1999, at least approximately $117,582 was paid out of a BLMIS bank account funded by a BLMIS operating account directly to Chase Manhattan Bank or Chase Manhattan Mortgage, in amounts corresponding to BONVENTRE's monthly payment obligations on the mortgage and/or home equity loan for the coop apartment BONVENTRE and his wife own in the building located at 505 East 79th Street, New York, New York 10021.

41.  Internal BLMIS records also show that, beginning at least as early as in or about 1992 through at least in or about 1999, at least approximately $318,408 was paid out of a BLMIS bank account funded by a BLMIS operating account directly to 79th Street Owners Inc. for maintenance, fees and/or assessments on BONVENTRE's coop apartment, Unit 17G and/or 17H, 505 East 79th Street, New York, New York 10021 (the "BONVENTRE 79th St. Coop").

42.  In addition, according to internal BLMIS records, beginning at least as early as in or about 1992 through in or about 2008, at least approximately $227,969 was paid out of a BLMIS bank account funded by a BLMIS operating account directly to the Richmond County Country Club, where BONVENTRE has been a member since in or about 1991.

17

### The Assets of Daniel and Barbara BONVENTRE

43.    BONVENTRE holds a significant amount of money and property in his own name, in his wife and/or their son's name, or in their names jointly.  This considerable wealth is overwhelmingly derived from BONVENTRE's salary, bonus, and other payments from BLMIS and the withdrawals from the Bonventre IA Accounts.

(a)    *The BONVENTRE Bank of America ("BofA") Accounts*

44.    BONVENTRE and his wife held joint checking and savings accounts at Bank of America.  At least as early as 1989, the checking account that, until recently, was held at Bank of America was held at National Westminster Bank.  By virtue of a series of bank mergers, this account was later held at Fleet Bank and, from in or about 2004, was held at Bank of America (joint checking account number 00 1119309083 in the name of Daniel and Barbara Bonventre), where BONVENTRE and his wife also held joint savings account number 4830 0094 9940 (hereinafter collectively referred to as the "BofA Accounts").  Available records show that, since at least January 2002, when the accounts held a cumulative cash balance of $48,771.23, the BofA Accounts were funded overwhelmingly, directly and indirectly, with transfers from BLMIS and property traceable to money BONVENTRE received from BLMIS.

45.    BONVENTRE's salary and bonus payments from BLMIS were

18

sent to the BofA Accounts.   Between in or about January 2002 and in or about December 2008, at least $3,433,665 of BONVENTRE's salary and bonus payments from BLMIS was deposited in the BofA Accounts.

46.   During the time period from in or about 2001 to in or about 2006, BONVENTRE received approximately $2,377,329.81 in transfers from the BLMIS IA Bank Account, representing purported returns on fictitious securities positions and other unaccounted for payments.

47.   Although the BofA Accounts were held jointly by BONVENTRE and his wife, according to a review of available records, any contributions BONVENTRE's wife may have made to the BofA Accounts were de minimis when compared to those made by BONVENTRE.   The records of the BofA Accounts, which are available for the period from approximately 2002 to approximately 2010, do not reflect any income or deposits directly attributable to Barbara Bonventre.   Since at least as early as 2002, BONVENTRE's wife has not been employed, and during that time earned no reported income.   In official documents, Daniel and Barbara Bonventre indicate Barbara Bonventre's occupation as "homemaker" since at least 2003.   Account applications submitted in or about late 2003 to Charles Schwab list Barbara Bonventre's occupation as "artist."

48.   On or about July 12, 2010, BONVENTRE wrote a check from one of the BofA Accounts in the amount of $150,000 to Capstone

19

Advisory Group, a forensic accounting and litigation support firm. On or about July 15, 2010, Barbara Bonventre wrote a check payable to herself in the amount of $55,000.

49.    The BofA Accounts appear to have been closed in or about August 2010.

(b)    *The Bonventre Citibank Account*

50.    The July 15, 2010 check drawn on the BofA account was signed by, made payable to, and endorsed by Barbara Bonventre.   On or about July 15, 2010, the check was deposited into Account No. 9982584826 at Citibank, N.A., held in the name of Barbara Bonventre, which was opened on or about July 13, 2010 (the "Bonventre Citibank Account").

51.    The sole signatory on the Bonventre Citibank Account is Barbara Bonventre, but the account is being funded with BONVENTRE's money—the $55,000 check drawn on the BofA account; three incoming wire transfers from BONVENTRE (dated on or about October 25, 2010, December 13, 2010, and January 13, 2010, each in the amount of $50,000); approximately $18,975 from a realtor in the area of Mantoloking, New Jersey, where BONVENTRE has a home on the Atlantic Ocean (see paragraphs 81-91, below); and Social Security payments to BONVENTRE.

52.    Withdrawals or debits to the Bonventre Citibank Account include (a) approximately $10,000 per month paid to Hudson

20

City Savings Bank, which holds the mortgage on the BONVENTRE Mantoloking Property (see paragraphs 81-91, below); (b) approximately $5,440 per month for maintenance, fees and/or assessments on BONVENTRE 79th Street Coop, Unit 17G and/or 17H (see paragraphs 230-236, below); and (c) credit card payments to American Express, Citicard and Bloomingdale's.

53.   The balance of the Bonventre Citibank Account as of on or about January 13, 2011, was approximately $51,965.

(c)   *The BONVENTRE Charles Schwab Account*

54.   Beginning in or about December 2003, BONVENTRE and his wife also had brokerage Account No. 8094 5431 at Charles Schwab (the "BONVENTRE Schwab Account" or the "Schwab Account"), which BONVENTRE used to conduct legitimate securities transactions (unlike the backdated, fictitious transactions in his IA Account).

55.   The Schwab Account was funded exclusively with five checks from the BofA Accounts—which totaled $1,705,000—that were deposited in the Schwab Account, as follows:

a.   On or about December 2, 2003, check number 5155 from one of the BofA Accounts was deposited in the Schwab Account in the amount of $300,000.

b.   On or about April 14, 2004, check number 5264 from one of the BofA Accounts was deposited in the Schwab Account in the amount of $235,000.

c.   On or about June 6, 2005, check number 5587 from one of the BofA Accounts was deposited in the Schwab Account in the amount of $420,000.   (Of the $420,000

deposit, approximately $400,000 was traceable to the proceeds from the fictitious Lucent trades in the Bonventre IA Account).

d.   On or about January 31, 2006, check number 5774 from one of the BofA Accounts was deposited in the Schwab Account in the amount of $250,000.

e.   On or about April 25, 2006, check number 5849 from one of the BofA Accounts was deposited in the Schwab Account in the amount of $500,000.  (This $500,000 was traceable to the proceeds from the fictitious Apple trades in the Bonventre IA Account).

f.   Accordingly, of the $1,705,000 deposited into the BONVENTRE Schwab Account, $900,000 was traceable to the backdated Lucent and Apple trades in Bonventre's IA Account.

g.   On or about November 30, 2009, the total value of the Schwab Account—including cash, money market funds, bonds, equity securities, mutual funds, and accrued interest—was approximately $1,876,987.46.

56.   Between November 2009—when the value of the Charles Schwab Account was nearly $1.9 million—and March 2010, there was only one significant transfer out of the Charles Schwab Account:  a wire transfer in the amount of $180,000 sent on or about December 11, 2009 to the Andrew J. Frisch Attorney Trust IOLA Account (the "Frisch IOLA Account").

57.   In or about March 2010, Charles Schwab informed BONVENTRE that it was closing his account, and that all cash and securities needed to be moved out of Charles Schwab.  In or about April 2010, BONVENTRE caused the contents of the Schwab Account to be transferred to the BONVENTRE Chase Investment Account, described

22

in paragraphs 58-60, below.

 (d) *The BONVENTRE Chase Investment Account*

  58. In or about March 2010, BONVENTRE opened Account No. CM7 304867 at Chase Investment Services Corp., in the name of BONVENTRE and his wife (the "BONVENTRE Chase Investment Account").

  59. In or about April 2010, BONVENTRE caused the contents of the BONVENTRE Schwab Account to be transferred to the BONVENTRE Chase Investment Account.

  60. The Government executed a warrant of seizure issued on or about January 21, 2011 for the contents of the BONVENTRE Chase Investment Account.  The value of the BONVENTRE Chase Investment Account as of January 24, 2011, was approximately $1,903,016.47.

 (e) *The Bonventre Chase UTMA Account*

  61. In or about 1997, BONVENTRE and/or his wife established a Uniform Transfers to Minors Act ("UTMA") account for their son, DANIEL BONVENTRE (the "Bonventre Chase UTMA Account"). The account, Account No. 936 0003166746 2, is currently held at JPMorgan Chase in the name of DANIEL BONVENTRE, Minor, Barbara Bonventre, Custodian Under UTMA, but was previously held at one or more other financial institutions.  The account balance as of in or about September 2010 was approximately $62,296.43.

23

(f)  The  BONVENTRE  Fidelity  Account  (Formerly  Held  at
     Cohmad/Bear Stearns)

62.  In or about March 1988, BONVENTRE and his wife opened
a brokerage account at Bear Stearns Securities Corp.  Later records
show the account, No. 126 00701, was held at Cohmad Securities
Corporation (the "Cohmad Account"). Like the Charles Schwab Account,
the Cohmad Account was used by BONVENTRE to conduct legitimate
securities transactions.

63.  The balance of the Cohmad Account as of December 31,
1999 was approximately $655,000 in cash and securities.  According
to available records, at least $400,684.56 of this amount was funded
with transfers from BLMIS.  Moreover, during the period from in or
about 1996 to in or about 1999, a portion of the $400,684.56 appears
to have been transferred directly from the BLMIS Operating Account.

64.  Between December 31, 1999, and April 16, 2009, all
additional funding to the Cohmad Account came from one of two sources:
BLMIS or the BofA Accounts.  Specifically, of the almost $2 million
in deposits into the Cohmad Account during that time period, (a)
approximately $1,519,622.53 came from BLMIS bank accounts funded by
the BLMIS Operating Account and the IA Bank Account (including the
proceeds of the check in the amount of $200,000 discussed in paragraph
157, above, and approximately $950,000 of the approximately $999,375
amount BONVENTRE made from the backdated Big Lots trades), and (b)

24

approximately $438,000 came from BONVENTRE's BofA Accounts.

65.   On or about April 16, 2009, BONVENTRE moved the Cohmad Account portfolio to Account No. Z72 715786 at Fidelity Investments, which is also known as FMR LLC (the "BONVENTRE Fidelity Account").

66.   BONVENTRE made numerous significant withdrawals from the BONVENTRE Fidelity Account between April 2009 and August 2010. For example:

a.   In or about December 2009, BONVENTRE caused $570,000 to be wired from the BONVENTRE Fidelity Account to the Frisch IOLA Account.

b.   On or about July 23, 2010, BONVENTRE caused an additional $70,000 to be wired from the BONVENTRE Fidelity Account to the Frisch IOLA Account.

c.   On or about June 29, 2010, BONVENTRE caused $150,000 to be wired from the BONVENTRE Fidelity Account to one of his BofA Accounts (presumably to be used for the payment to Capstone Advisory Group described in paragraph 48, above).

67.   The Government executed a warrant of seizure issued on or about January 21, 2011 for the contents of the BONVENTRE Fidelity Account.   The value of the BONVENTRE Fidelity Account as of that date was approximately $1,977,885.64.

   (g)   *Certain Funds Held on Account for BONVENTRE in the Andrew J. Frisch Attorney Trust—IOLA Account*

68.   The property traceable to the Charles Schwab Account and the BONVENTRE Fidelity Account includes at least $820,000 transferred by BONVENTRE to the trust account of his criminal defense

25

attorney, Andrew J. Frisch—$180,000 transferred on or about December 11, 2009 from the Schwab Account, $570,000 transferred from the BONVENTRE Fidelity Account in or about December 2009, and an additional $70,000 transferred from the same account on or about July 23, 2010.  All three transfers were sent to the Andrew J. Frisch Attorney Trust IOLA Account No. 9943361400 at Citibank, N.A. (the "Frisch IOLA Account").  (See paragraphs 56 & 66, above).

69.  On or about December 21, 2010, the Government sent a letter to Mr. Frisch reminding him that the forfeiture allegation in the Indictment sought a money judgment of at least $154.5 billion against BONVENTRE; advising that the three wire transfers to his attorney trust account were traceable directly to the proceeds of the fraud perpetrated through BLMIS and therefore were forfeitable to the United States; and asking that he "freeze" any unearned funds or property provided by BONVENTRE pending final adjudication of the Government's forfeiture claims.  The Government also requested an accounting showing any funds counsel believed had been earned but not drawn from the Frisch IOLA Account as of Mr. Frisch's receipt of the letter.

70.  Accordingly, any funds held on account for BONVENTRE in the Frisch IOLA Account as of December 21, 2010—with the exception of those funds that had been earned as of that date, but not yet drawn from the Frisch IOLA Account—are subject to forfeiture to the United

States.

(h)  *Certain Funds Held on Account For BONVENTRE by Capstone Advisory Group*

71.    On or about June 29, 2010, BONVENTRE caused $150,000 to be wired from the BONVENTRE Fidelity Account to one of his BofA Accounts.  On or about July 12, 2010, BONVENTRE wrote a check from one of the BofA Accounts in the amount of $150,000 to Capstone Advisory Group ("Capstone").

72.    Capstone Advisory Group LLC, located at 104 W. 40th Street, 16th Floor, New York, NY 10018, provides services that include forensic accounting and litigation support.

73.    In its December 21, 2010 letter to Mr. Frisch (see paragraph 69, above), the Government advised that the $150,000 check to Capstone was also traceable directly to the proceeds of the BLMIS fraud and therefore was forfeitable to the United States.  Based on the Government's assumption that Capstone was working for BONVENTRE under the direction of Mr. Frisch, the Government asked Mr. Frisch to convey to Capstone the Government's requests for a "freeze" pending adjudication of its forfeiture claims and an accounting.

74.    Accordingly, any funds held on account for BONVENTRE by Capstone as of the date Mr. Frisch relayed to Capstone the information in the Government's December 21, 2010 letter—with the exception of those funds that had been earned, but not drawn, when

27

Mr. Frisch gave such notice to Capstone—are subject to forfeiture to the United States.

(i)   *The BONVENTRE National Integrity Retirement Accounts*

75.   In or about April 2005, BONVENTRE established the National Integrity Retirement Accounts at National Integrity Life Insurance Company—IRA Account No. 1100092154 in the name of Daniel BONVENTRE, and IRA Account No. 1100092160 in the name of Barbara Bonventre—which were funded exclusively from the BofA Accounts.

76.   The Government executed a warrant of seizure issued on or about January 21, 2011 for the BONVENTRE National Integrity Retirement Accounts.   The combined surrender value of the accounts on or about that date was approximately $42,400.

(j)   *The BONVENTRE Pioneer Retirement Accounts*

77.   In or about April 1998, BONVENTRE established Pioneer Investments Account No. 06204778379, PIM Rollover IRA Cust Trust for Daniel BONVENTRE, and Account No. 06204778388, PIM Rollover IRA Cust Trust for Barbara Bonventre (collectively, the "Pioneer Investment Accounts").

78.   In or about September 2010, the combined value of the Pioneer Investment Accounts was approximately $30,850.53.

(k)   *The BONVENTRE MFS Retirement Accounts*

79.   In or about April 1998, BONVENTRE established Account No. 0013 08186857582, in the name of MFS Heritage Trust Co Trustee

IRA R/O Daniel BONVENTRE, and Account No. 0013 08186857586, in the name of MFS Heritage Trust Co Trustee IRA R/O Barbara BONVENTRE (the "BONVENTRE MFS Retirement Accounts"). The MFS Retirement Accounts were funded initially with a rollover of funds held at American General Securities and subsequently with contributions from the BofA Accounts.

80. As of on or about September 16, 2010, the combined value of the MFS Investment Accounts was approximately $42,866.92.

(1)   *The BONVENTRE Edgewater Property*

81. In or about November 2008, just before the collapse of BLMIS, BONVENTRE purchased an oceanfront home known as 16 Edgewater Terrace, Mantoloking, New Jersey 08738 for $2,550,000 (the "BONVENTRE Edgewater Property"). The property has a Mantoloking mailing address, but is situated in Brick Township.

82. BONVENTRE financed the purchase with approximately $1,000,000 in cash from the BofA Accounts, and a mortgage obtained from Hudson City Savings Bank in the amount of $1,500,000.

83. On or about October 28, 2008, BONVENTRE filed an application for a mortgage to finance $1,500,000 of the purchase price for the Edgewater Property. BONVENTRE, who was the sole applicant for the mortgage, stated in connection with the application that he had been employed by BLMIS for forty years and one month, held the position of Director of Operations, and had a monthly gross

income of $99,663. BONVENTRE declared the 79th Street Coop as an asset and valued it at $5,000,000, and also reported owning approximately $1,085,305 in cash. BONVENTRE stated that his liabilities were $25,491 owed to BMW Financial Services and approximately in $11,547 in credit card debt.

84. According to other records obtained from Hudson City Savings Bank, dated on or about November 3, 2008, BONVENTRE was the sole borrower on the mortgage application, but title to the property would be held not in BONVENTRE's name, but in the name of Barbara Bonventre, his wife, and Daniel M. Bonventre, his son.

85. According to the mortgage application, the purchase also required the payment of approximately $48,723 in closing costs and $7,500 in obligations that had been prepaid by the seller.

86. On or about November 4, 2008, a check drawn on one of the BofA Accounts in the amount of $500 was paid to Hudson City Savings Bank in connection with the purchase or financing of the Edgewater Property.

87. On or about November 25, 2008, a check drawn on one of the BofA Accounts in the amount of $15,000 was paid to Hudson City Savings Bank in connection with the purchase or financing of the Edgewater Property.

88. On or about November 28, 2008, $950,000 was transferred between the two BofA Accounts—from the savings accounts

to the checking account.

89.  On November 28, 2008, a bank check in the amount of approximately $1,008,018 was purchased with funds from one of the BofA Accounts.  The bank check was payable to the trust account of the attorney handling the closing for BONVENTRE.  (Approximately $4,485 was refunded and deposited in one of the BofA Accounts on or about December 2, 2008).

90.  When the sale closed, the property was put in the names of BONVENTRE's wife, Barbara Bonventre, and son, Daniel M. Bonventre, as joint tenants with rights of survivorship. BONVENTRE's name is not listed on the deed and he is not otherwise an owner of record of the property.  The mortgage that was recorded in favor of Hudson City Savings Bank indicates the owners of record, Barbara Bonventre and Daniel M. Bonventre, as the borrowers or mortgagors under the security instrument.

91.  Payments on the mortgage for the Edgewater Property, in the amount of approximately $8,717.88 a month, were made from one of the BofA Accounts beginning on or about January 2, 2009.  From January 2009 to August 2010, these payments totaled approximately $172,405.80.

(m)  *The BONVENTRE 79th Street Coop*

92.  In or about July 1986, BONVENTRE and his wife purchased Apartment 17G in the building located at 505 East 79th

31

Street, New York, New York 10021, specifically, shares of capital stock of 79th Street East Owners Inc. and a proprietary lease for Apartment 17G.   The shares and the lease are held jointly in the names of Daniel R. BONVENTRE and Barbara G. Bonventre.

93.   The purchase was financed, in part, with a mortgage in favor of National Westminster Bank USA, 175 Water Street, New York, New York.   National Westminister Bank recorded its security interest by the filing of a UCC 1 statement on or about July 16, 1986 in the New York City Register.

94.   On or about July 21, 1993, Chemical Bank, Home Equity Department, 300 Jericho Quadrangle, Jericho, New York, 11753, filed a UCC 1 statement to record a security interest in the 79th Street Coop.   BONVENTRE and Barbara Bonventre are indicated as the debtors on the filing instrument.

95.   Beginning at least as early as in or about 1996 through at least in or about 1999, BONVENTRE paid at least approximately $63,051 on the mortgage and/or home equity loan directly out of a BLMIS bank account funded by a BLMIS operating account.   See paragraph 40, above.

96.   According to available records for the BofA Accounts, which during this time were held at Fleet Bank, between on or about November 15, 2002, to November 28, 2003, thirteen payments totaling approximately $91,707 were made to Chase Manhattan Mortgage from the

32

account.

97.   On November 23, 2003, a check drawn on one of the BofA Accounts (then at Fleet) in the amount of $51.05 was written to Chase Manhattan Mortgage Corp.   The check bears a memo indicating that this is the "final payment" for the home equity loan.

98.   On or about February 13, 2004, Chase Manhattan Mortgage Corporation recorded or filed in the Office of the City Register of the City of New York a UCC 3 termination statement releasing the debtors Daniel BONVENTRE and Barbara Bonventre from the security interest filed on or about July 21, 1993 by Chemical Bank.

99.   Beginning at least as early as in or about 1996 through at least in or about 1999, BONVENTRE paid at least approximately $138,464 for maintenance, fees and/or assessments on BONVENTRE's coop apartment, Unit 17G and/or 17H, directly out of a BLMIS bank account funded by a BLMIS operating account.   See paragraph 41, above.

100. From in or about November 2002 to in or about August 2010, payments totaling approximately $430,105.26 were made from one of the BofA Accounts to 79th Street Owners Inc. in connection with maintenance fees and/or assessments on the 79th Street Coop.

CONCLUSION

101. During the time period of the acquisition of the

33

Specific Property, neither BONVENTRE nor his spouse had a significant source of income or other wealth other than funds received, directly and indirectly, from BLMIS.

102. During the time period of the maintenance of the Specific Property, neither BONVENTRE nor his spouse had a significant source of income or other wealth other than funds received, directly and indirectly, from BLMIS

103. Based upon the foregoing, I respectfully submit that the entry of the First Money Judgment and Second Money Judgment is appropriate and that the Specific Property constitutes proceeds of the offenses charged in Counts One through Three, Six through Eleven, and Eighteen of the Indictment.

104. I declare under penalties of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Dated:    New York, New York
          June 30, 2014

PAUL F. ROBERTS, JR.
Special Agent
Federal Bureau of Investigation

Sworn to or subscribed
before me this 30th day of June 2014

Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2018

34