UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES,

          v.                                      No.  10CR228-LTS

DANIEL BONVENTRE. et al.,

--------------------------------------------------------x

OPINION AND ORDER

APPEARANCES:

| | |
|---|---|
| UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK<br>   By:  Matthew L. Schwartz, Esq.<br>       John T. Zach, Esq.<br>       Randall W. Jackson, Esq.<br>One St. Andrew's Plaza<br>New York, NY 10007 | LAW OFFICES OF ANDREW J. FRISCH<br>   By:  Andrew J. Frisch, Esq.<br>       Jeremy B. Sporn, Esq.<br>       Amanda Bassen, Esq.<br>40 Fulton Street, 23rd Floor<br>New York, NY 10038<br>*Counsel for Daniel Bonventre* |

                             *-and-*

SERCARZ & RIOPELLE, LLP
   By:   Roland G. Riopelle, Esq.
810 Seventh Avenue, Suite 620
New York, NY 10019
*Counsel for Annette Bongiorno*

                             *-and-*

DUANE MORRIS, LLP (NJ)
   By    Eric R. Breslin, Esq.
       Melissa S. Geller, Esq.
One Riverfront Plaza
1037 Raymond Blvd., Suite 1800
Newark, NJ 07102
*Counsel for Jo Ann Crupi*

LAW OFFICES OF GORDON
MEHLER, PLLC
  By:  Gordon Mehler, Esq.
         Sarah Lum, Esq.
747 Third Avenue, 32nd Floor
New York, NY 10019
*Counsel for Jerome O'Hara*

       *-and-*

KRANTZ AND BERMAN, LLP
  By   Larry H. Krantz, Esq.
         Kimberly A. Yuhas, Esq.
747 Third Avenue, 32nd Floor
New York, NY 10017
*Counsel for George Perez*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

After a more than five month trial, thirty-one counts of the above-captioned Superseding Indictment were submitted to the jury, and Defendants Daniel Bonventre ("Bonventre"), Annette Bongiorno ("Bongiorno"), Jo Ann Crupi ("Crupi"), Jerome O'Hara ("O'Hara") and George Perez ("Perez," collectively, "Defendants") were convicted of each of the crimes which with they were charged.  The charges included: conspiracy to defraud investment advisory clients and conspiracy to commit securities fraud; conspiracy to engage in accounting fraud and to defraud banks; conspiracy to commit tax fraud; securities fraud; falsifying the records of a broker-dealer; falsifying the records of an investment adviser; causing a false and misleading filing to be made with the Securities and Exchange Commission ("SEC"); bank fraud; making and subscribing to false income tax returns; corruptly obstructing the lawful administration of the internal revenue laws; and tax evasion.  Fewer than all of the Defendants were charged in some of the counts.

The Defendants move, separately and, as to certain issues, jointly, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal and, pursuant to Federal Rule of Criminal Procedure 33, for a new trial.[1]  The Court has considered carefully the parties' voluminous submissions and arguments.  For the following reasons, the Defendants' motions are denied in their entirety.  Familiarity with the more than 12,000-page trial record and the hundreds of thousands of pages of exhibits received in evidence is presumed.

---

[1]     Although Defendant Bongiorno did not herself file a Rule 33 motion, she indicates in her moving papers that she "join[s] in all motions and arguments made by [her] co-defendants, to the extent such motions and arguments may be applicable to [her]."  (Bongiorno Mem. at 1, Bongiorno Reply at 1.)

I.      BACKGROUND

The following brief overview of the charges and the trial proof is drawn from the trial record including exhibits and the S10 Indictment.  In 1960, Bernard L. Madoff ("Madoff") founded Bernard L. Madoff Investment Securities ("Madoff Securities"), which, from at least around the late 1970s, functioned as a broker-dealer, in that it operated a market making business on behalf of its institutional investors and performed proprietary trading (i.e., traded its own holdings).  These two lines of business constituted what was referred to as the "House 05" side of the firm.  Madoff Securities also had an investment advisory business (the "IA business"), which managed accounts for individual clients under what was known as the "House 17" side of Madoff Securities.  The charges in this case relate primarily to the IA business, which was run as a Ponzi scheme for several decades, perpetrated through the creation of fake trading and account records.  At least as far back as 2002, the broker-dealer or House 05 side of the firm was insolvent and depended on infusions of cash from the IA business.

The Defendants each began working at Madoff Securities at different times. Bonventre and Bongiorno began working for Madoff Securities in the 1960s; Crupi joined in the early 1980s and O'Hara and Perez joined the firm in the early 1990s.  All five Defendants were still employed at the firm in 2008, when Madoff was arrested.  Bonventre worked as the self-titled "Director of Operations" for the enterprise, mainly with the House 05 business; Bongiorno and Crupi worked in the IA business; and O'Hara and Perez worked as computer programmers with duties relating to House 05 and House 17.  The more than forty witnesses who testified at trial included other former Madoff Securities employees, many of whom had been charged with crimes and were testifying as cooperators; bank representatives who had worked with Madoff Securities;

former clients of Madoff Securities; expert witnesses on fraud, computer programming and tax

return preparation; government agents and private investigators who investigated the firm after

Madoff's arrest; Defendants Bongiorno and Bonventre; and defense character witnesses.  The

Government also introduced hundreds of pages of exhibits relating to Madoff Securities' operation,

how the fraud was committed, and the Defendants' involvement in criminal activities at the firm.


## II.   DISCUSSION

### A.   Rule 29 Motions for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29(a), at the conclusion of the

Government's case-in-chief or after the close of all of the evidence, "the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction."  The Court previously denied Rule 29(a) motions by Bonventre (on the tax

counts against him); by Bongiorno (on the tax counts against her) and by Crupi (on the tax and bank

fraud counts against her) (Counts Four, Five and Nineteen through Thirty-Three of the S10

Indictment.  (See February 21, 2014, Order (docket entry no. 734) and February 25, 2014, Order

(docket entry no. 740).)[2]  The Court, however, reserved decision on the Defendants' other Rule 29(a)

motions on the securities counts and on Bonventre's motion as to the bank fraud counts.  When a

court reserves decision on a Rule 29(a) motion, "it must decide the motion on the basis of the

evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  The Defendants renewed

---

[2]     The Court granted Bonventre's motion for a judgment of acquittal on the counts
charging him with violating the Employment Retirement Income Security Act
("ERISA") (Counts Five and Nineteen).  See February 21, 2014, Order (docket
entry no. 734).

their Rule 29 motions on all counts at the close of the defense cases, pursuant to Rule 29(c).[3]  (See

Trial Transcript ("Tr.") 10730-32.)  "Motions under Rule 29(c) are governed by the same standard

as motions under Rule 29(a)."  United States v. Martinez, 978 F. Supp. 2d 177, 185 (E.D.N.Y.

2013).  However, on a Rule 29(c) motion, the Court may consider all of the trial evidence and not

only the evidence introduced during the Government's case-in-chief.  See United States v. Jones,

No. 02CR527, 2003 WL 21362798, at *2 (E.D. Pa. June 10, 2003).

        "In considering [a Rule 29] motion, the Court must determine whether, 'after viewing

the evidence in the light most favorable to the prosecution, . . .  any rational trier of fact could [find]

the essential elements of the crime beyond a reasonable doubt.'"  United States v. Choullam, No.

05CR523-LTS, 2008 WL 3861356, at *1 (S.D.N.Y. Aug. 19, 2008) (citations omitted).  "A

defendant challenging the sufficiency of the evidence bears a heavy burden"  United States v.

Kozeny, 667 F.3d 122, 139 (2d Cir. 2011), because the evidence must be viewed in the light most

favorable to the Government and with the assumption "that the jury resolved all questions of witness

credibility and competing inferences in favor of the prosecution."  United States v. Abu-Jihaad, 630

F.3d 102, 134 (2d Cir. 2010).  "Viewing the evidence in the light most favorable to the government

[also] means . . . recognizing that the government's evidence need not exclude every other possible

hypothesis[.]"  United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks

and citations omitted).  "Nonetheless, a conviction based on speculation and surmise alone cannot

stand."  United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1996) (citation omitted).  The Court

must apply the sufficiency test "to the totality of the government's case and not to each element, as

each fact may gain color from others," and "may enter a judgment of acquittal only if the evidence

---

[3]        See Fed. R. Crim. P. 29(c) (the "defendant may move for a judgment of acquittal,
or renew such a motion, within 14 days after a guilty verdict or after the court
discharges the jury, whichever is later").

that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citation omitted).

The credibility of a testifying witness is particularly within the province of the jury, not that of a reviewing court.  See United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) ("the jury and not the court [must] determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his [or her] testimony") (internal quotation marks and citations omitted).  When a court reserves decision on a motion, under Rule 29(b), it must decide the motion on the basis of the evidence at the time the ruling was reserved, which here was at the close of the Government's case, but under Rule 29(c), the court may consider the defense case and if a defendant testifies, as Bonventre and Bongiorno did, the jury is entitled to draw negative inferences from the defendant's trial testimony or use it "to reach contrary conclusions."  United States v. Roldan-Zapata, 916 F. 2d 795, 803 (2d Cir. 1990).  "By taking the stand and offering his [or her] own version of events, [the defendant] waive[s] any claim as to the sufficiency of the Government's case considered alone."  Id. (internal quotation marks and citations omitted).  A "jury is entitled to disbelieve the defendant's attempts at exculpatory explanation, [and] a testifying defendant might inadvertently add weight to the government's case" by "plac[ing] his own credibility in issue."  United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008) (internal quotation marks and citations omitted).

1.    Bonventre's Rule 29 Motion

Defendant Bonventre moves for acquittal on Counts Three, Six, Eight, Nine, Twelve, Fifteen and Eighteen, renewing his February 17, 2014, motion (see docket entry no. 719), on which

the Court reserved decision, arguing that the evidence against him was insufficient to sustain the convictions.[4]

      a.      *Bonventre's Rule 29 Motion: Counts Eight and Fifteen*

Count Eight charges Bonventre with committing securities fraud by creating or aiding and abetting the creation of "false and misleading" Madoff Securities FOCUS Reports and annual financial statements that were provided to customers (S10 Indictment ¶ 98).  Count Fifteen charges Bonventre with "willfully and knowingly" aiding and abetting the filing of a false and misleading FOCUS Report with the SEC in or about May 2006 (id. ¶ 112).  The proof, viewed in the light most favorable to the Government, showed that the IA customer statements were false in that they misrepresented, inter alia, the execution of trading in the accounts, the holdings in individual accounts, and the timing of purported transactions in the accounts, and that the FOCUS Reports were false because, inter alia, they omitted banking information relating to the IA business, including loans that were on the books and records of Madoff Securities and assets and liabilities of the IA business.  Both of these crimes require proof that the defendant acted  "willfully and knowingly" rather than "mistakenly or inadvertently;" Bonventre argues that the Government did not prove this element.[5]  According to Bonventre, the Government failed to establish his knowing

---

[4]      To the extent that Bonventre also seeks to renew his previously filed Rule 29 motion on Counts Four and Twenty through Twenty Four, which was already denied by the Court, the motion for judgment of acquittal on those counts is denied for the reasons stated in the Court's February 21, 2014, Order.  (See docket entry no. 734.)

[5]      Bonventre does not deny that the FOCUS reports were false (see, e.g., Tr. 1413-17 (Gov't expert Bruce Dubinksy explaining why they were false); or that Bonventre contributed information that made them false (see, e.g., Tr. 3909 (Cotellessa-Pitz explaining that FOCUS report information was derivative of the firm's other financial statements)).

participation in the creation and dissemination of annual financial statements to IA clients at Madoff

Securities because he did not provide any statements to IA clients and there was no evidence that he

had responsibility for the financial statements that were signed by David Friehling ("Friehling") and

filed with the SEC.  Bonventre testified that he had no involvement in the preparation, review or

submission of the FOCUS reports, or in their ultimate filing.  He argues that, even if he did send

such reports to bank representatives, that does not mean that he knew the contents of the reports.

Bonventre contends that the testimony of cooperating witness Enrica Cotellessa-Pitz ("Cotellessa-

Pitz") corroborates his position that it was Cotellessa-Pitz who prepared the reports and not

Bonventre and that he was just a backup eFOCUS user, who never actually used the eFOCUS

system.[6]  (Tr. 9621-22, 9965-66, 10093.)  Bonventre further contends that he did not think the firm

was trying to hide the IA business from regulators because there was publicity regarding the

business and the public figures, foundations and celebrities who were investors.  (See Tr. 9619-24.)

Thus, he argues, the Government did not prove his knowing and willful participation in the filing of

false FOCUS Reports.

    "The 'relevant question' in this inquiry is 'whether, after viewing the evidence in the

light most favorable to the [Government], any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d

Cir. 2008) (citations omitted).  A review of the evidence compels an affirmative answer.  The

evidence presented on the Government's case included, but was not limited to, the following:

Friehling testified that Bonventre provided him with the information that Friehling used in

compiling the financial statements.  (Tr. 2877-78.)  Bonventre supervised Cotellessa-Pitz, who filed

---

[6]   The eFOCUS system was a mechanism for filing FOCUS reports with the SEC
electronically.

the FOCUS reports.  Bonventre knew that the FOCUS reports were submitted to the SEC (see Tr.

3269 (Monika Arora ("Arora"), Bank of New York Mellon ("BONY") representative, testifying that

she spoke to Bonventre to arrange the bank's receipt of Madoff Securities FOCUS reports)).

AlixPartners employee Meaghan Schmidt ("Schmidt") also testified about a conversation that she

had with Bonventre regarding the FOCUS reports in which he explained to her how Madoff

Securities calculated the regulatory capital figures on its FOCUS reports by omitting the IA

business.  (Tr. 788-81.)  Thus, there was considerable evidence at trial in the Government's case

alone from which a jury could reasonably infer that Bonventre was a knowing and willful participant

in the false filings.

When Bonventre testified, he admitted that he was familiar enough with the content

of the FOCUS reports to have known at the time that they did not include assets of the IA business,

but said that he did not think that Madoff Securities was trying to hide the IA business because of

the publicity surrounding the business and its high profile investors.  (See Tr. 9624 (Q: Why did you

believe that the FOCUS reports did not serve to hide Mr. Madoff's investment advisory business?

A.  It [referring to the FOCUS reports] clearly didn't include those – those figures and that activity

[that were publicly reported]."))  By testifying about his involvement with the FOCUS reports,

Bonventre placed his own credibility at issue and a rational jury could have found his explanation

incredible, as appears to have occurred here.  A rational juror, taking all inferences in the light most

favorable to the Government, could easily have found that Bonventre was knowingly involved in the

creation of false Madoff Securities FOCUS reports and annual financial statements, which were

provided to IA clients, and knowingly aided and abetted the filing of the false FOCUS reports with

the SEC.  Accordingly, Bonventre's motion is denied insofar as he seeks acquittal on Counts Eight

and Fifteen.

b.       *Bonventre's Rule 29 Motion: Counts Six, Nine and Twelve*

Count Six charges Bonventre with "participat[ing] in the creation and dissemination of records and documents that misrepresented to [IA] clients of Madoff Securities that various trading activity had occurred in their accounts."  (S10 Indictment ¶ 94.)  Counts Nine and Twelve, respectively, charge Bonventre with creating, or aiding and abetting the creation of, false trading records and false and fraudulent client account statements and trade confirmations between the early 1970s and 2008, in violation of recordkeeping requirements that applied to Madoff Securities in its roles as a broker-dealer and an investment adviser.  (Id. ¶¶ 100, 106.)  Bonventre contends that his lack of direct involvement in the preparation of client account statements or trade confirmations and representations made to IA clients precludes his conviction on Counts Six, Nine and Twelve as either a principal or an aider and abetter.[7]  On a Rule 29 motion, "the absence of direct evidence establishing [Bonventre's] guilt is not dispositive.  In fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt."  United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004) (internal citations omitted).

The fact that Bonventre did not personally speak to IA clients or personally provide them with account statements or confirmations does not preclude his conviction on these counts, especially in light of the evidence of Bonventre's extensive involvement in and supervision of both the House 05 and House 17 sides of the firm.  Bruce Dubinksy ("Dubinsky") a certified fraud examiner, testified that the Chase '703 account, which Bonventre oversaw and carefully reconciled

---

[7]       For his motion as relating to Counts Six, Nine and Twelve, Bonventre relies principally on the papers filed in support of his February 17, 2014, motion for acquittal.

(see e.g., Tr. 1414-16, GX 105-c57), was critical to the perpetration of the fraud, as it propped up the Ponzi scheme, permitting customers to receive distributions and hiding the fraud (see, e.g., Tr. 1455-56; GX 5000-1 at 79, 142, 145, 147).  As Friehling explained, Bonventre was "the one responsible [for] mantain[ing] the general ledger and the books and records" of Madoff Securities.  (Tr. 2874.) The Government presented evidence that, inter alia, Bonventre concealed the IA business's assets on the firm's General Ledger even though expenses of the IA business were included; that Bonventre asked the IA employees to make corrections in the "checkbook" for the Chase '703 Account (Tr. 910-13); that Bonventre attempted to hide the Chase '703 account from auditors (see Gov't Opp. at 29 (reciting evidence and testimony)) and that Bonventre was involved in creating false documents to conceal the fraudulent IA business activity (e.g., he provided multiple versions of the same documents to tax auditors and helped Madoff and others create false DTC reports).  There were also notes introduced as evidence at trial indicating Bonventre's involvement in backdating trades.  For example, there was a note by Bongiorno that read "Dan [Bonventre] had me put through a profit trade for $399,810.00 then add that figure to cap additions!" (GX 105-b6) and Bonventre wrote a note to Bongiorno stating that "per our phone conversation" he "need[ed] a long term capital gain of $449000" (GX 105-b24 at 4).  Although these notes were specific to backdating trades in Bonventre's account, a rational jury could have inferred that Bonventre was also involved in the creation and dissemination of fake records and documents that misrepresented to clients that trading activity had occurred in their accounts.  Bonventre also trained many of the people who now admit to having taken part in the fraud, including Frank DiPascali ("DiPascali"), who testified that Bonventre trained him in back office operations to fool auditors, and Cotellessa-Pitz.  By training others to perpetrate the fraud, Bonventre was aiding in its commission.  Taking all evidence in the light most favorable to the Government, the evidence supports a rational jury's inference that

Bonventre is guilty beyond a reasonable doubt of the crimes charged in these counts.  Accordingly,
Bonventre's motion for a judgment of acquittal on Counts Six, Nine and Twelve is denied.

        c.        _Bonventre's Rule 29 Motion: Counts Three and Eighteen_

Bonventre also moves under Rule 29 as to Counts Three and Eighteen, which charge
him with conspiracy to commit accounting fraud and to defraud banks.  To prove that Bonventre
committed bank fraud, the Government was required to demonstrate: (1) that he engaged in a course
of conduct concerning a material matter designed to deceive a federally chartered or insured
financial institution into releasing property and (2) that he intended to victimize the institution by
exposing it to actual or potential loss.  See United States v. Nkansah, 699 F.3d 743, 748 (2d Cir.
2012).  At trial, the Government presented evidence that Bonventre misrepresented the purpose of
bank loan applications and the ownership of bonds offered as security.  Bonventre argues that the
evidence did not show that he knew that the loan applications contained misrepresentations and,
even assuming that he had sufficient knowledge that the loan applications contained
misrepresentations about ownership of client bonds, the evidence did not show that he had any
understanding as to the effect of those representations or that he knew that they were material.

However, witnesses from JP Morgan Chase and BONY testified that Bonventre was
their sole or primary contact with Madoff Securities over several decades and had regularly lied to
them in order to obtain loans for the firm.  (Tr. 3264, 6346-7.)  For example, Bonventre told Arora
that he needed to extend Madoff Securities' line of credit to support a newly hired trading team,
which was not true.  (Tr. 3290-91, 3299.)  There was also evidence that he offered the banks
securities that he knew belonged to customers of the IA business as collateral for bank loans.  (See
Cotellessa-Pitz's Testimony, Tr. 3701 "we used securities that . . . belonged to customers that had
investment advisory accounts, and we represented them as our own.")  The bank witnesses testified

that these were material matters and it was reasonable for the jury to infer that Bonventre understood

that submitting an application to secure a loan with collateral that did not actually belong to Madoff

Securities was a material misrepresentation, and that falsely stating the purpose of the loan was

likewise a material misrepresentation.  (See, e.g., Tr. 6354.)  The Court finds that there is sufficient

evidence in the record for a rational jury to have found Bonventre guilty beyond a reasonable doubt

on these counts.  Bonventre's Rule 29 motion is therefore denied in its entirety.


2.       Bongiorno's Rule 29 Motion

Bongiorno also moves generally to dismiss all counts against her pursuant to Federal

Rule of Criminal Procedure 29(c), to preserve her right to challenge the evidence on appeal, and

specifically argues for a judgment of acquittal on the tax-related counts against her.  The Court

previously found that the evidence presented as to the tax counts on the Government's case, when

viewed in the light most favorable to the Government, was sufficient to support a conviction.  (See

Feb. 21, 2014, Order at 15 (docket entry no. 734).)  In her current motion, Bongiorno again argues

that no Government witness actually opined that her regular withdrawals of thousands of dollars

from the Special 1 and the Special 2 Accounts were taxable income; that she always had sufficient

"capital" in all her Madoff Securities accounts to support the withdrawals from the Special 1 and

Special 2 Accounts; that it was routine for accounts at Madoff Securities to be netted against each

other; that Bongiorno's withdrawals were made openly so she could not have been hiding anything;

and that Bongiorno routinely declared on her tax returns hundreds of thousands of dollars in income

from her Madoff Securities accounts, so it does not make sense that she would refrain from

declaring these withdrawals in order to conceal income she believed was taxable.  In response to the

Government's argument that Bongiorno's netting argument was belied by the full balance

distribution checks prepared from her other accounts on the eve of Madoff Securities' collapse, she

cites her own testimony that she needed to deposit checks drawn to her in order to write checks back

to Madoff Securities to net out the balances that she owed in connection with the Special 1 and

Special 2 Accounts (see Tr. 10579-80).  She argues that the jury had no basis for finding that the

checks drawn on the Special 1 and 2 Accounts were anything other than capital withdrawals, which

were not taxable, or that she believed that they were anything else.

        The Court previously denied Bongiorno's Rule 29 motion seeking acquittal on these

tax fraud counts and there was no evidence presented in Bongiorno's defense case relating to the tax

fraud counts aside from her own testimony, which the jury was entitled to reject.  Moreover, "[b]y

taking the stand and offering h[er] own version of events, [Bongiorno] waive[d] any claim as to the

sufficiency of the Government's case considered alone, and the jury was entitled to conclude that

[Bongiorno]'s version of the events was false and thereby infer h[er] guilt."  See United States v.

Adams, 216 F.3d 1073, 1073 (2d Cir. 2000) (internal quotation marks and citations omitted).  At the

most basic level, there never were any real investments, capital or income underlying Bongiorno's

Madoff Securities accounts.  If, as is clear from the convictions, the jury found that Bongiorno knew

that the trading was false, the abundant evidence supporting the finding of that knowledge was more

than sufficient to support a finding that Bongiorno's cash withdrawals were not legitimate non-

taxable withdrawals of accumulated capital.  For these reasons and for substantially the reasons

stated in the Court's February 21, 2014, Order, the Court finds that there was sufficient evidence for

a rational jury to conclude that Bongiorno was guilty beyond a reasonable doubt of the crimes

charged in these counts.

        Bongiorno does not offer any specific arguments under Rule 29 as to the rest of the

counts on which she was charged.  The Court, having reviewed carefully all of the evidence

presented in the case against Bongiorno, finds that the evidence introduced at trial, both as of the close of the Government's case and on the record as a whole, was sufficient to support the remainder of her convictions.  Bongiorno's Rule 29 motion is denied.

### 3.    Crupi's Rule 29 Motion

Crupi also moves for acquittal, pursuant to Federal Rules of Criminal Procedure 29(a) and 29(c), asking that her convictions on the thirteen counts against her set out in the S10 Indictment be overturned.[8]  The Court previously denied the portion of Crupi's Rule 29(a) motion seeking acquittal on the bank fraud (Counts Sixteen and Seventeen) and the tax evasion counts (Counts Thirty-One to Thirty Three) against her.  Crupi argues that there was insufficient evidence presented at trial to support her convictions, especially those for bank fraud, conspiracy to commit bank fraud and tax evasion.

#### a.    *Crupi's Rule 29 Motion: Counts Sixteen and Seventeen*

The jury convicted Crupi of bank fraud and conspiracy to commit bank fraud, charges that were based on her involvement in a scheme to obtain four mortgages and one loan for David Kugel, Craig Kugel and Heather Kugel (the "Kugels").  Crupi renews her previously filed Rule 29(a) motion (docket entry no. 711), which was denied by the Court on February 25, 2014 (see

---

[8]    These counts charge Crupi with: conspiracy to defraud Madoff Securities IA Clients (Count 1); conspiracy to commit securities fraud and to falsify books and records relating to audits of Madoff Securities (Count 2); securities fraud on IA clients (Count 6); securities fraud related to review by KPMG (Count 7); falsifying records of a broker dealer – fake trading documents (Count 9); falsifying records of a broker dealer – SEC audits and KPMG Reviews (Count 10); falsifying records of an IA- fake trading documents (Count 12); falsifying records of an IA- SEC Audits and KPMG reviews (Count 13); conspiracy to commit bank fraud (Count 16); bank fraud (Count 17); tax evasion – 2004 (Count 31); tax evasion – 2007 (Count 32); and tax evasion – 2008 (Count 33).

docket entry no. 740) and incorporates its arguments by reference, arguing that there was insufficient evidence to sustain the intent element of the bank fraud charges.  According to Crupi, the Government did not prove: a scheme to defraud a financial institution; that Crupi had the requisite intent to commit bank fraud; that she joined the alleged conspiracy to commit bank fraud; or the materiality of alleged misrepresentations made to the banks.  (See docket entry nos. 711 and 738.)  No additional evidence relevant to the bank fraud counts was introduced between the close of the Government's case-in-chief, when Crupi made her Rule 29(a) motion, and the close of all of the evidence.  The Court previously considered Crupi's arguments carefully and found that there was sufficient evidence for a rational jury to find Crupi guilty beyond a reasonable doubt on these counts.  (See February 25, 2014, Order, docket entry no. 740.)

        The Government established at trial that, inter alia, the Kugels sought and obtained mortgages and a loan from federally-insured financial institutions (see GX 5000-11) and that Crupi provided letters and other documentation of the Kugels' purported IA account values at Madoff Securities to the banks in support of the same.  The evidence further demonstrated that Crupi knew that the purpose of the documentation was to induce banks to provide loans and that the documentation that she provided to the banks did not match Madoff Securities' records.  In particular, David Kugel provided figures for use in the confirmations that eliminated liabilities and took into account amounts not otherwise credited on the IA account books.  Crupi used Kugel's information in correspondence with banks.  Her verification of these and similar figures, sometimes in forms she attested to under warnings of "severe penalties" for any fraud or misrepresentation (see GX 200-31), is sufficient to give rise to an inference of the requisite criminal intent.  Moreover, both David and Craig Kugel testified that Crupi had independent conversations and correspondence with lenders when she provided account values.  (See, e.g., Tr. 2575-81; Tr. 7610; GX 105-c135; GX

200-30).  The jury was entitled to infer that the information that Crupi provided was material in that

it influenced the banks' decisions to offer the mortgages.[9]

Taking the facts in the light most favorable to the Government, a rational jury could

have inferred that Crupi intended to defraud lenders by causing them to extend loans to the Kugels

based on false information.  Accordingly, the Court denies Crupi's motion on these counts.

b.      *Crupi's Rule 29 Motion: Counts Thirty-One Through Thirty-Three*

Crupi was also convicted on Counts Thirty-One through Thirty-Three, which charged

her with tax evasion for the years 2004, 2007 and 2008, arising out of her failure to declare on her

taxes her personal use of the Madoff Securities corporate American Express card.  Crupi had filed a

motion for judgment of acquittal on these counts under Rule 29(a) (see docket entry no. 691), which

the Court denied on February 21, 2014 (see docket entry no. 734).  No additional evidence relating

to Crupi's tax liability was introduced after the close of the Government's case.  Crupi renews this

motion under Rule 29(c), incorporating her earlier arguments, and contends that there was

insufficient evidence introduced at trial for the jury to find her guilty.  However, DiPascali testified

at trial that Crupi saw him using his own corporate card for extravagant personal expenses and

inquired whether she could get her own for business expenses, which DiPascali said was a plausible

request because "from time to time, [Crupi] had legitimate business expenses that could be put on

the card" (Tr. 5379-80), and there was evidence demonstrating that Crupi was sufficiently

knowledgeable about taxes to sometimes intentionally incur fake losses in her and her family's IA

accounts to offset other taxable income.  (See, e.g., GX 2000-93.)  The jury thus could have

rationally inferred that Crupi knew that employer-paid personal expenses would have constituted

---

[9]      See, e.g., United States v. Rossomonando, 144 F.3d 197, 201, n.5 (2d Cir. 1998)
("the value of credit . . . transactions inherently depends on the ability of banks
. . . to make refined, discretionary judgments on the basis of full information").

taxable income if properly reported.  The Government's case for understatement of Crupi's tax

liability did rest almost entirely on inference but, as the Court explained in its previous Order, the

amount, vendor and purchase location of the non-travel expenses, the travel destinations and the

facts that Crupi's family joined her in traveling and their names appeared on credit card statements,

could have led a rational jury to infer, beyond a reasonable doubt, that significant portions of her

charged expenses were personal.  (See, e.g., GX 208-108, 208-132, 208-210, 208-215, 208-231,

2000-7.)  The Government also introduced evidence sufficient to demonstrate that none of the

charges to Crupi's American Express card was reported on her tax return, which, together with

Government expert Margo Dabney's computations illustrating the tax effects of additional ordinary

income in amounts comparable to Crupi's unreported American Express charges, was sufficient to

support an inference of Crupi's substantial tax liability.  Accordingly, the Court denies Crupi's

motion on the tax evasion counts.

> c.    *Crupi's Rule 29 Motion: Counts One, Two, Six, Seven, Nine, Ten, Twelve and Thirteen*

Crupi also argues that she should be acquitted on all of the other counts on which she

is charged because the Government's case against her is based entirely on her role in tracking the

Chase '703 account (a role which she shared with others), her notes, and the testimony of DiPascali

– a convicted perjurer and liar.  According to Crupi, there were many other employees who have not

been charged and were provided with the same information and had the same or similar roles at

Madoff Securities as Crupi.  In reviewing the record on a Rule 29 motion, the evidence must be

assessed "not in isolation but in conjunction."  United States v. Diaz, 176 F.3d 52, 89 (2d Cir. 1999).

The relevant evidence, which included Kugel's testimony that he gave Crupi information that she

used to fabricate back-dated arbitrage trades in client accounts, DiPascali's testimony that Crupi

helped Madoff change client account names in connection with audits, DiPascali's testimony that he

told Crupi that the firm had run out of money in the weeks before Madoff's arrest, evidence that

Crupi continued to take in customer investments even in the final days before Madoff's arrest, and

evidence that Crupi back-dated losses in her own account for tax purposes, was amply sufficient to

support a reasonable juror's determination that Crupi was guilty of the crimes charged in these

counts.[10]  DiPascali's perjury conviction was brought forth for the jury's consideration; whether to

credit his testimony was a matter in the province of the jury.  Accordingly the Court denies this

element of Crupi's Rule 29 motion for acquittal.  See Guadagna, 183 F.3d at 130 (a court may

overturn a jury's verdict only if the evidence supporting the verdict is "nonexistent or so meager that

no reasonable jury could find guilt beyond a reasonable doubt") (internal quotation marks and

citation omitted).

### 4.    O'Hara's Rule 29 Motion

O'Hara argues that the evidence at trial did not support the inference that he had the

criminal knowledge or intent necessary to commit the crimes with which he was charged and that he

therefore should be acquitted under Federal Rule of Criminal Procedure 29(a) of all eight counts on

which he was found guilty at trial.  Perez and O'Hara had jointly moved under Rule 29 on February

17, 2014, and the Court reserved decision on that motion.  (See docket entry no. 722.)  O'Hara

contends that the evidence presented at trial gives "equal or nearly equal circumstantial support to a

theory of guilt and a theory of innocence" and, thus, O'Hara should be acquitted of all counts of

conviction.  See Lorenzo, 534 F.3d at 159.  O'Hara cites evidence in the record that DiPascali

viewed Perez and O'Hara as "two dopey computer programmers" (Tr. 5283) and regularly lied to

---

[10]     A more complete overview of the relevant evidence is set forth in the
Government's memorandum in opposition to the motions. (See Gov. Opp. at 21,
23-55, 74.)

them; that O'Hara and Perez were not told about what happened during the audits; and that they followed the instructions that they received from Liz Weintraub ("Weintraub"), who had developed much of the firm's computer system and software before either O'Hara or Perez began working at Madoff Securities.  (See Tr. 411, 680, 4118, 4575, 6103.)  O'Hara also argues that the letter that he wrote to himself expressing his resolve to continue doing his regular work and not any "special work" because he was uncomfortable with it (see Tr. 6116-18), his own notes in which he recorded how Madoff asked him to do a special project, which he did not want to do (GX 105-d3 at 10-11), and the fact that he paid back a $687,000 bridge loan all show that he did not have the criminal knowledge and intent necessary to commit the crimes of which he was convicted.

At trial, the Government introduced evidence, inter alia, that O'Hara created programs to generate different and conflicting versions of fraudulent books and records, using random number generators and other algorithms as opposed to actual trading data (see, e.g., Tr. 5171-73, 7925-38); that he created programs to generate fraudulent DTC reports for regulators and auditors; and that he created programs to change the books and records of the market making business in connection with tax audits (see, e.g., Tr. 7868-70, 7881-82.)  DiPascali testified that O'Hara told Madoff to shut down the IA business (Tr. 5283), participated in a toast to "tricking the auditors" (Tr. 5176-77), and was involved in tossing around a report during an audit to make it appear old.  (Tr. 4612-18, 5181-83.)  Haresh Hemrajani ("Hemrajani") (another computer programmer) testified that O'Hara told him not to help investigators and became angry when he saw Hemrajani talking to an investigator about one of the fraudulent IA programs after Bernard Madoff's arrest.  (Tr. 8559-60.)

Under Rule 29, "the convictions must be affirmed, so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt."  Diaz, 176

F.3d at 89.  Based on the evidence described above, and for the reasons detailed in the Government's opposition to this motion, a rational juror could have inferred sufficient knowledge and intent on O'Hara's part to support convictions on the substantive counts with which he was charged.  As for the conspiracy charges, at a minimum, "with all of these red flags flying," the jury "could reasonably infer that" O'Hara "was conscious that he was playing a part in a fraudulent scheme, even though he may not have known all of the details."  United States v. Panza, 750 F.2d 1141, 1150 (2d Cir. 1984).  Accordingly, O'Hara's Rule 29 motion is denied.

     5.     Perez's Rule 29 Motion

     Perez also renews his Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal.  Perez argues that the Government failed to prove criminal intent for all of the charges against him because the circumstantial evidence was insufficient to support the requisite inferences of such intent (especially since DiPascali regularly lied to O'Hara and Perez); and specifically, that the Government failed to prove that Perez and O'Hara joined in either of the conspiracies alleged in Counts One and Two or that they were, in fact, separate conspiracies;[11] that the Government has failed to prove Count Six, which alleges securities fraud directed at IA clients, because Perez and

---

[11]     The argument that the Government cannot show that Counts One and Two were in fact separate conspiracies was raised previously by the Defendants and is repeated in a conclusory manner in Perez's Rule 29 motion.  (See, e.g., Mem. in Support of Supplemental Pretrial Motions by Jerome O'Hara and George Perez (docket entry no. 335).)  During the trial, the Government proffered sufficient evidence to demonstrate that Count One, which charges a broad conspiracy to deceive Madoff Securities investors, was separate from Count Two, which charges an associated scheme to defraud auditors from the SEC and KPMG and that each conspiracy had different goals and different, albeit overlapping, employees from Madoff Securities involved.  Without specific arguments by Perez as to how one conspiracy subsumed the other, the Court will not revisit this issue at this juncture.  (See also Gov. Opp. at 23-59 (detailing the evidence relating to the different fraudulent schemes).)

O'Hara had no direct contact with clients and there was no circumstantial evidence that they knew that clients were being defrauded; that the Government has failed to prove Count Seven, which alleges securities fraud directed at auditors, as there was no direct or circumstantial proof that Perez and O'Hara knew that the auditors were being defrauded; and that the Government has failed to prove that the securities frauds alleged in Counts Six and Seven were separate schemes to defraud. Perez also argues that the Government has failed to prove that any false statements made to auditors were material and that, for Counts Nine, Ten, Twelve and Thirteen, which charge Perez with falsification of books and records of a broker-dealer and an investment adviser, there was insufficient proof from which a rational juror could infer that Perez knew that the programs he worked on were being used to create false or fraudulent books and records.[12]

Perez's Rule 29 motion focuses on Counts One, Six, Nine and Twelve[13] since, according to Perez, for those counts, the Government's theory depends on the proposition that Perez knew that all of the trades in the IA business were false and knew of a scheme to defraud the clients of Madoff Securities and to provide fake trading records to those clients, and the evidence at trial did not support this inference.  Perez argues that the Government's case against him related almost

_____

[12]     The Court has received the Government's letter acknowledging that it was incorrect when it stated in its opposition brief that Perez "created programs that changed the books and records of the market making business, in connection with tax audits" and describing what it should have written.  (See Gov't June 5, 2014, Letter, docket entry no. 1004.)  The Court has also received Perez's letter in response, objecting to the Government's letter and seeking to clarify some of the statements made by the Government.  (See Perez June 5, 2014, docket entry no. 1005.)  The Court has considered the arguments made in both letters.

[13]     These charges are: conspiracy to defraud Madoff Securities IA clients (Count One); a substantive count of defrauding Madoff Securities IA clients (Count Six) and Counts Nine and Twelve, which charge Perez with falsifying books and records by sending "fake" trading records to clients or aiding and abetting such activity.  (See Reply at 3.)

entirely to his participation in audits conducts by the SEC and KPMG, from 2004 to 2006, and did
not have anything to do with clients or the IA business, and that there was no proof of any relevant
conversations between DiPascali and Perez before that point.  Perez further argues that Madoff's
fame and the fact that the Government's own cooperating witnesses (with the exception of Kugel
and DiPascali) had no idea that the trades were fake, despite their acknowledged participation, lends
credence to the theory that Perez also did not realize that the trading was fake.  (See, e.g., Tr. 3969
(Cotellessa-Pitz Direct).)  According to Perez, a rational jury thus could not have found that Perez
had the requisite intent to commit these crimes.

           The evidence introduced at trial included testimony that Perez created programs to
generate different and conflicting versions of fraudulent books and records using random numbers
and other algorithms instead of actual data, that he told Madoff to shut down the IA business, and
that he told AlixPartners Managing Partner Matthew Cohen ("Cohen") that he accepted money from
Madoff to write programs that changed client statements.  (See Tr. 620-21.)  There was also
evidence that, by 1994, Perez had created a prototype for the "special programs" used to create fake
trading records.  (See, e.g., Tr. 7801, 7899-7903 (Rich Diedrich describing Perez's comments on
programs and referring to a program called special 1I that Perez worked on in 1994), 8068-71 (Rich
Diedrich, explaining that GEN001, created by Perez in 1994, created random trades by "[t]aking
share value, the number of shares, and pricing values, multiplying them together, and generating
times that way")).  In 1991 and 1992, Perez and O'Hara both also worked on STMTPro, which was
used to create false books and records, and in 1993, following the separation of the House 17 and
House 05 systems onto two different servers, O'Hara and Perez were permitted to access the
programs associated with House 17 – the fraudulent IA business – while other computer
programmers were not.  (See Tr. 8550, 8672-74.)  While Perez's suggested chain of inferences may

well have been supported by the evidence, the jury was not obliged to draw those inferences, and the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence."  United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008) (alterations, citations, and internal quotation marks omitted).  Considering the record as a whole and viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements of these counts beyond a reasonable doubt.  Therefore, Perez's Rule 29 motion is also denied.


B.    Rule 33 Motions for a New Trial

              Bonventre, Crupi, O'Hara and Perez all move for a new trial under Federal Rule of Criminal Procedure 33, arguing that they were prejudiced by prosecutorial misconduct and that the evidence in the record cannot support the jury verdict on many of the counts of conviction.[14]  Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The decision as to whether to grant a motion for a new trial is "firmly within the discretion of the trial judge" and "[i]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses" and "is not required to view the evidence in the light most favorable to the Government."  United States v. Tarantino, No. 08CR0655-JS, 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012).  "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence

---

[14]    Bongiorno joins in the general Rule 33 arguments for a new trial relating to the perceived improprieties of the Government's addresses to the jury.

must be assumed, . . . that discretion should be exercised sparingly." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (citations omitted). Motions for a new trial pursuant to Rule 33 "are disfavored in this Circuit" and "should be granted only in the most extraordinary circumstances." United States v. Figueroa, 421 F. App'x 23, 24 (2d Cir. 2011) (internal quotation marks and citations omitted) (emphasis in original). "'The ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice.' To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'" United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).

1.     New Trial Motions Based on the Government's Alleged Misconduct  During Jury Addresses

All five Defendants argue that they should be granted a new trial under Rule 33 due to the Government's misconduct during its jury addresses. Improper remarks or a "prosecutor's misrepresentation of testimony may require reversal because of the inevitable prejudice to the defendant." United States v. Drummond, 481 F.2d 62, 63-64 (2d Cir. 1973). However, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S.1, 11 (1985). Improper statements necessitate a new trial when such statements "caus[e] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks, citations and alteration omitted). Defendants thus bear a "heavy burden" of demonstrating that the alleged errors during the Government's arguments were "so severe and significant as to result in the denial of [the defendants'] right to a fair trial." United States v. Coplan, 703 F.3d 46, 86 (2d Cir. 2012) (internal quotation marks and citations omitted). In

determining whether improper statements rise to this level, courts consider (1) "the severity of the misconduct," (2) "the measures adopted to cure the misconduct," and (3) "the certainty of conviction absent the misconduct."  <u>United States v. Elias</u>, 285 F.3d 183, 190 (2d Cir. 2002).

a.  *The Government's Opening Statement*

Defendants O'Hara and Perez argue that they were prejudiced by remarks in the Government's opening statement because the Defendants were improperly lumped together as a mass of criminal wrongdoers and liars and because statements made during the opening were not supported by proof at trial.[15]  For example, Perez argues that the Government's description of Perez's activities in connection with the fraud during the opening statement was "drawn out of whole cloth," because there was no evidence demonstrating Perez's involvement with anything before the 2004 SEC Audit (Perez Mem. at 31) and there was no evidence to support the prosecutor's characterization of Perez's and O'Hara's declarations to Madoff in 2006 that they would no longer work on certain computer programs (<u>see</u> Tr. 96, 103-104).  Defendants also argue that the Government's opening statement ran afoul of the rule recently reiterated by the Second Circuit in <u>United States v. Certified Env't Servs. Inc.</u>, 753 F.3d 72, 86 (2d Cir. 2014), that the "Government may not introduce the bolstering aspects of a cooperation agreement unless and until the witness's credibility has been questioned in ways that 'open the door' to the admission of the agreement."

---

[15]     During the opening however, Perez raised no objection other than to complain that the Government did not repeat the statement, "the evidence will show," enough and to request that the Court give an instruction to the jury that opening statements are not evidence, which the Court gave.  (Tr. 110.)  Perez raised other issues after the opening, but pursues only one of those issues in the post-trial motions.  Thus, with regard to the opening statement, except for Perez's argument on improper bolstering, the issues that Perez and O'Hara argue now were not raised as objections during the trial.

"In determining whether a defendant is entitled to a new trial because of a prosecutor's improper opening statements, the Second Circuit has held that [t]he test is whether the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." United States v. Chu, No. 02CR673-RMB, 2004 WL 1176647, at *2 (S.D.N.Y. May 26, 2004) (internal quotation marks and citations omitted, alterations in original).  A court evaluating such a claim should consider: "(i) whether the prosecutor acted in good faith; (ii) [the] degree of prejudice to the defendant; and (iii) whether the jury was instructed that the opening statements were not evidence." Id.

Here, Defendants have not shown bad faith on the part of the prosecutor during the opening statement and there was evidence presented during the trial that supported the Government's characterization of Perez and O'Hara's involvement in the fraudulent scheme, as well its characterization of Perez and O'Hara's 2006 conversation with Madoff.  The Government's references to the Defendants as a group were legitimate in light of the conspiracy charges and significant evidence introduced at trial regarding the Defendants' participation, working closely with one another over many years, in the fraudulent activities committed at Madoff Securities.  The jury was, furthermore, instructed repeatedly during the trial that the Government's burden was to prove each charge against each Defendant.

To the extent that the evidence at trial did not support the Government's opening statement, all Defense counsel had the opportunity to point out any discrepancies between what the prosecutor said and what the evidence showed throughout the more than five months of trial and during the defense summations – defense counsel, in fact, did so.  Moreover, the Court instructed the jury twice – both before and after the Government's opening statement – that the opening statement was just argument and not evidence.  (See Tr. 52-53; Tr. 114.)  Defendants' improper bolstering

point is well taken.  Perez raised it as a "minor objection," immediately after the Government's

opening (Tr. 112), to the Government's reference in its opening to the truth-telling provisions of the

cooperation agreements.  While the statements – that one witness "agreed to testify truthfully" (Tr.

105), that the cooperators "as part of their agreement with the government . . . are obliged to tell the

absolute truth" (id.) and that the cooperators "[have] got something to gain if they testify truthfully"

(Tr. 105-06) – should not have been made and the Court should have considered a curative

instruction, the errors were not of sufficient magnitude when considered separately and in the

context of the arguments as a whole to have deprived the Defendants of a fair trial.

> b.    *The Government's Principal Summation*

Perez also argues that he should be granted a new trial under Rule 33 on the basis of

what he characterizes as the prosecutor's mischaracterization of his alleged "confession" to Cohen

and the prosecutor's improper grouping of the Defendants, referring to them as "they," "these

people" and "these defendants" in the opening summation.  (See Tr. 10932-1933, 10987, 11006.)

"The government, however, has broad latitude in the inferences it may reasonably suggest to the jury

during summation," and "[i]mproper summation statements violate a defendant's due process rights

only if they cause substantial prejudice to the defendant."  United States v. Edwards, 342 F.3d 168,

181 (2d Cir. 2003) (internal quotation marks and citation omitted).  As noted above, a new trial is

appropriate "only when the statements, viewed against the entire argument before the jury, deprived

the defendant of a fair trial."  United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008) (internal

quotation marks and citation omitted).

Here, the Government drew fair inferences from the evidence presented at trial.

Cohen testified that he asked Perez about closing his account, that Perez said that he had told

Madoff that he was uncomfortable with certain activity he had been performing at the firm and that

Perez was given money as a result of this conversation.  (See Tr. 620.)  The Government based a

permissible, if aggressive, argument on this testimony.  As previously discussed, there was also

extensive evidence presented at trial concerning how the Defendants had interacted and worked

together as Madoff Securities employees and how aspects of their work had combined to support

and perpetuate the fraud.  Furthermore, the Court reminded counsel (at the side bar and in the

presence of the jury) and the jury of the need for specificity as to each Defendant.  (See, e.g., Tr.

10987 ("[PEREZ'S COUNSEL]:  Your Honor, objection.  'They.'  [AUSA]: I'm sorry.  Mr. O'Hara

– I understand.  Sorry.  THE COURT:  So you're not talking about they, you're talking about

individuals? [AUSA]:  I withdraw that.  Yes.  I'm talking about Mr. O'Hara . . ."); see also

Tr.11940-11941 (Jury Instructions) ("Although there are allegations in common to all of the

defendants in the different counts, each individual defendant and each count must be considered

separately.  You must return a separate unanimous verdict as to each individual defendant on each

count on which you are asked to render a verdict.").)  Examining the statements in the context of the

trial, the court finds that none of the comments by the prosecutor during the opening summation

caused "the defendant substantial prejudice by so infecting the trial with unfairness as to make the

resulting conviction a denial of due process."  Elias, 285 F.3d at 190 ("[r]emarks of the prosecutor in

summation do not amount to a denial of due process unless they constitute egregious misconduct")

(internal quotation marks and citations omitted).

        c.     *The Government's Rebuttal Summation*

      All of the Defendants join in the motion for a new trial insofar as it is based on what

they refer to as the Government's improper and inflammatory remarks in its rebuttal summation

which, they argue, when considered cumulatively, deprived them of due process and thus warrant a

new trial.  Specifically, Defendants object to what they characterize as the prosecutor's use of

inflammatory analogies, misrepresentations of the record, improper vouching for witnesses, insertion of the prosecutor's own credibility into the case and posing as a de facto expert on criminals and criminal behavior, improper denigration of defense counsel and references to the Defendants' case as "ridiculous" or "absurd," and use of irrelevant and prejudicial non-sequiturs. According to the Defendants, these arguments were not only improper, but were "calculated to inflame the passions or prejudices of the jury," and thus denied them a fair trial.  United States v. Spivack, 376 F. App'x 144, 145 (2d Cir. 2010) (internal quotation marks and citations omitted).[16]

The Defendants have listed multiple instances of each of these categories of remarks and arguments.  The Court has considered carefully all of the parties' arguments, just as it did during trial when it sustained many of the objections that were raised contemporaneously, reprimanded the prosecutor and gave numerous curative instructions.  "In assessing whether prosecutorial misconduct caused 'substantial prejudice,'[the Second Circuit] has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct."  See Elias, 285 F.3d at 190. The Defendants have a "heavy burden" of demonstrating that any misconduct was "so severe and significant as to result in the denial of [the defendants'] right to a fair trial."  Coplan, 703 F.3d at 86.  "Each case must be

---

[16]    The Government contends that the Defendants did not raise many of the arguments that they make now as objections at trial and thus, have waived their right to object in the absence of plain error.  See United States v. Canniff, 521 F. 2d 565, 572 (2d Cir. 1975).  However, Defendants argue that there were so many problems with the Government's summation that defense counsel could not stand up to object without appearing obstructionist.  Defendants did raise multiple contemporaneous objections during the rebuttal summations (as noted by the Government at trial and in its opposition to this motion (see Gov. Opp. at 118)); Defendants' concern about the strategic impact of frequent objections is also valid.  The Court does not parse the timing of the objections in its analysis that follows, however, because even assuming that all objections had been timely raised, the Defendants have not established that they suffered substantial prejudice warranting a new trial under Rule 33.

carefully assessed as to its individual circumstances."  United States v. Friedman, 909 F.2d 705, 710 (2d Cir. 1990).

Beginning with the severity of the misconduct, the Court has considered carefully each of the allegedly improper remarks and arguments made by the prosecutor during the rebuttal summations that were identified by the Defendants in their motions.  The use of analogy when addressing the jury is not improper (in fact, many of defense counsel's summations also contained analogies and metaphors) and the Government is entitled to draw inferences regarding a defendant's conduct, even if there is no testimony explicitly supporting such argument, based on the "broad latitude the government is given to suggest reasonable inferences to the jury."  United States v. Salameh, 152 F.3d 88, 138 (2d Cir. 1998).  The inferences drawn here were aggressive, but were for the most part supported by the extensive evidence presented by the Government throughout the trial.

The Second Circuit has "warned prosecutors not to vouch for their witnesses' truthfulness . . . and has even reversed a conviction when a prosecutor repeatedly told the jury that certain testimony was true."  United States v. Modica, 663 F.2d 1173, 1179 (2d Cir. 1981) (citations omitted).  However, "[w]hile the prosecution may not vouch for the credibility of its witnesses, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion."  United States v. Carr, 424 F. 3d 213, 227 (2d Cir. 2005) (rejecting argument that the government engaged in improper vouching for its witnesses where "the defense continually sought to undermine the credibility of the government's witnesses by emphasizing that their testimony was provided pursuant to cooperation agreements") (internal quotation marks and citation omitted).  In its rebuttal summation, the Government responded to arguments made by the Defendants that

Government witnesses had lied and that the Government had coerced them into perjuring themselves (see, e.g., Tr. 11579), by arguing that the evidence demonstrated that the Government's witnesses had been truthful, or that common sense consideration of the record as a whole should lead to the conclusion that the cooperating witnesses were credible.  The comments made by the prosecutor did not conflate his own integrity with that of the witnesses, unlike the conduct held improper in Floyd v. Meachum, 907 F.2d 347, 350-51, 354 (2d Cir. 1990), where the prosecutor used her own name and presence as a prosecutor to "invit[e] the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial."  Cf. United States v. Caracappa, 614 F.3d 30, 41-42 (2d Cir. 2010) (no impropriety in government's rebuttal summation statement that "I submit to you that based on the circumstances of the case and the circumstances of what Mr. Kaplan told him, you can completely trust everything [the witness] said 100 percent, 100 percent").

   Nor was there impropriety in the Government's appeals to the jurors' common sense. The Second Circuit has held that a jury is not required to forget about common sense: "[j]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).  Where the prosecutor veered off into discussions on typical "criminal" behavior, the Court promptly gave a curative instruction informing the jury that there was no evidence in the record regarding typical criminal behavior and that they were not to consider the suggestions that behavior was typical of bank robbers, drug dealers and other types of criminals in evaluating the evidence.  (Tr. 11747-48.)

   The Defendants also argue that the prosecutor improperly impugned the Defendants and their cases by repeatedly referring to their arguments as "ridiculous" and "absurd."  However, "it is not the prosecutor's job to stress the significance of a defense theory."  Brown v. Senkowski,

No. 97CIV3862-MBM, 97CIV4415-MBM, 2004 WL 2979792, at *13 (S.D.N.Y. Dec. 14, 2004),

aff'd 175 F. App'x 430  (2d Cir. 2006).  "To the contrary, arguing the implausibility of an

opponent's theory is one of the tools at the prosecutor's (and defense counsel's) disposal."  Id.

(citing United States v. Rivera, 971 F.2d 876, 885 (2d Cir. 1992) (where the court found that

prosecutor's comment that defense arguments were "ridiculous" was permissible)).  Many of the

remarks made in the rebuttal summation were ill-conceived and unworthy of the institutional stature

of the United States Attorney's Office.  However, in the context of Rule 33 motion practice, courts

have rejected the argument that repeatedly questioning the logic of the defense's arguments is

improper.  See United States v. Griffith, No. 99 CR786-HB, 2000 WL 1253265, at *11-12 (S.D.N.Y.

2000).  The repeated characterizations here were unoriginal perhaps, but not improper.  The

Government would certainly have done better had it chosen to focus on arguing the specific

evidence rather than spend most of its argument repeating derogatory generalizations and wandering

into peculiar similes, but its lapses in judgment did not, in the context of the entire trial, including

the Court's contemporaneous curative instructions (see, e.g., 11747-48, 11800), deprive the

Defendants collectively, or individually, of a fair trial.  Nor was the trial rendered unfair by the

prosecutor's reference to Judge Constance Baker Motley (the import of which was at best

ambiguous and at worst unfathomable) and other non-sequiturs.

       As for the measures adopted to cure the misconduct, where the Government misstated

the record, the Court gave prompt curative instructions and pointed out specific evidence when the

defense raised valid objections to the prosecution's characterizations of the evidence.  The Court

also gave detailed instructions on the law prior to the parties' summations with a comprehensive

PowerPoint presentation, stressing the need to find facts as to each Defendant and each charge

without bias or prejudice to any party, and provided instructions at the end of each day that: "the

closing arguments that you have heard are just that.  They are not evidence. . . . It will be your

decision as jurors, as judges of the facts, to determine what it is that the actual evidence proves or

doesn't prove."  (See, e.g., Tr. 11158.)  At the end of the case, the Court gave detailed and

unchallenged instructions to the jury that the Government was entitled to "no greater consideration

than that accorded to any other party to a litigation" and that "arguments by lawyers are not

evidence, because the lawyers are not witnesses" and "if your recollection of the facts differs from

the lawyers' statements, it is your recollection which controls," together with comprehensive

instructions on the substantive and procedural aspects of the jurors' responsibilities as finders of

fact.  (Tr. 11917, 11918.)  See Elias, 285 F.3d at 191-92 (curative instruction in court's final charge

was sufficient to cure misconduct even where district judge had declined to give any prior

instructions); see also Rivera, 971 F.2d at 884-85 (district court's instructions to jury obviated any

prosecutorial error).

        In rejecting new trial applications based on alleged prosecutorial misconduct, many

courts have relied on the third factor, "the certainty of conviction absent the misconduct," Coplan,

703 F.3d at 86.  See United States v. Guerrero, __F. App'x__, 2014 WL 1258355, at *1 (2d Cir.

Mar. 28, 2014) ("[t]he government's statements, even if considered misconduct, were harmless

when tempered by the district court's explicit and multiple jury instructions to correct the error, and

when viewed in light of the overwhelming evidence against" the defendant).  Here, while each

Defendant had non-frivolous arguments for reasonable doubt, the evidence against each Defendant

(which included, as individually applicable, handwritten documents; testimony of expert witnesses

in forensic accounting, the operation of the broker dealer business, computer programming and other

areas relevant to the charges; testimony from witnesses to whom certain Defendants had made

incriminating statements after the collapse of Madoff Securities; detailed records from the computer

systems indicating how certain Defendants had participated in creating false records; and fraudulent records prepared in connection with various audits by regulatory agencies and investors) was amply supportive of the guilty verdicts.

Although the Court had expected the Government to take a higher and less rhetorical road in its summations in light of all of the evidence at its disposal, in order to provide the jury with assistance in handling that evidence in the context of the specific decisional obligations that were carefully explained in the jury instructions, the Government's summation – when considered in the context of the meticulous presentation of all of the evidence, arguments in the trial as a whole and the curative instructions – did not so taint the trial so as to make it fundamentally unfair.[17]

---

[17]     To the extent that O'Hara raises any issue concerning the jury's deliberations (see O'Hara Reply at 6-7, clarifying that he was not arguing that the verdict should be overturned or that the court should conduct an inquiry in the jury's deliberations, but rather that the length of the jury's deliberations and comments to the press demonstrate the improper conduct of the prosecutor and spillover prejudice), "[a]bsent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997). The jury here sent out multiple detailed requests for testimony and exhibits, the lawyers and the Court commented on how attentive and engaged they were throughout trial, and "statements made by the jurors . . . to the press . . . may not be considered by this court in deciding the defendant's motion." United States v. Siraj, 468 F. Supp. 2d 408, 422, n. 4 (E.D.N.Y. 2007). The juror comments reported in the press were, in any event, relatively innocuous, and the fact that jury credited DiPascali's testimony was obvious from the verdict.

2.      Bonventre's Rule 33 Motion

        a.      *Bonventre's Rule 33 Motion: Counts One to Three, Six to Fifteen and Eighteen*

Bonventre argues that, "[w]hile courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, where, as here, exceptional circumstances relate to witness testimony that is 'patently incredible,' 'the court may intrude upon the jury function of credibility assessment.'"  (Bonventre Mem. at 30 (citing Ferguson, 246 F.3d at 133 (internal quotation marks and citations omitted).)  According to Bonventre, the Government's burden of proof on Counts One through Three, Six through Fifteen, and Eighteen (the "fraud counts") required the Government to establish that Bonventre acted knowingly and willfully, and the Government did not carry its burden of disproving Bonventre's good faith.  However, although Bonventre's view may reflect a permissible perspective on the evidence, it is not the only – or even the most compelling – view.  In its earlier discussion of Bonventre's Rule 29 motion, the Court found that there was sufficient evidence to support his convictions on counts Three, Six and Fifteen.  For substantially the reasons outlined in that section, Bonventre's Rule 33 motion for a new trial on those counts is also denied.  A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and [only] in the most extraordinary circumstances."  Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).  Those circumstances are not present here.  See also United States v. Middlemiss, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution.").

        In his Rule 33 motion, Bonventre also argues that the evidence in support of Count Seven, which charges Bonventre with securities fraud relating to the European accounting firm's reviews, is particularly scarce, as Bonventre established that he was not even in the office for the

KPMG audit, but was on jury duty (Tr. 9582-83), and there was no evidence that he was involved in the second audit with KPMG.  He further argues that the Government only presented the testimony of a witness, Christine Coe, who did not identify the employees with whom the auditors met at Madoff Securities and of DiPascali, who had no general credibility, and that there was no corroboration of DiPascali's testimony regarding Bonventre's role in the audits.  Bonventre also argues that the fact that, as he testified, he reconciled the Chase '703 account for one year and otherwise at Ruth Madoff's behest is not sufficient to prove his knowledge and willfulness on these counts and that, in connection with a Rule 33 motion, a court may weigh evidence and assess credibility of witnesses.  "However, a court should only intrude upon the jury function of credibility assessment in exceptional circumstances.  The question for this Court is whether manifest injustice would result if it allows a guilty verdict to stand."  United States v. Gottesman, No. S5 13CR571-KBF, 2014 WL 1909482, at *1 (S.D.N.Y. May 12, 2014) (internal citations omitted).  The Court finds no injustice inherent in the guilty verdicts.

       As for the conspiracy charges in Counts One and Two and the bank fraud charged in Count Eighteen, after evaluating the entire record of the trial, the Court is not left with a "real concern that an innocent person may have been convicted" and finds that the evidence at trial supported Bonventre's convictions on these counts.  Ferguson, 246 F.3d at 134.

       b.     *Bonventre's Rule 33 Motion: Counts Four, Twenty to Twenty-Four*

       Bonventre also argues that he should be granted a new trial on Counts Twenty to Twenty-Three, which charge him with subscribing to false individual income tax returns for the years 2003, 2004, 2006 and 2007, and Counts Four and Twenty-Four, which charge him with conspiracy to commit tax fraud and obstructing and impeding the internal revenue laws in connection with Bernard Madoff's tax audits.  Bonventre argues, with regard to the first set of

counts, that the Government did not establish that Bonventre willfully and knowingly signed one or more of his individual federal income tax returns, knowing it was false.  Bonventre asserts that Madoff misled him as to his personal tax liability and that the only testimony as to his state of mind in connection with the tax returns was his own.  (Tr. 9675-76.)  Bonventre also testified that he wrote checks to reimburse Madoff Securities for some of the financial benefits provided to him, and that there were errors in the Government's charts regarding Bonventre's tax liability.  (See Tr. 9677-80.)  As to his convictions on Counts Four and Twenty-Four, Bonventre contends that he should be granted a new trial because Madoff lied to him and gave him an unsuspicious explanation for the work that needed to be performed, and that the accountant Friehling's testimony corroborated Bonventre's assertion that Bonventre did not know what he was doing was fraudulent.  (Tr. 3180, 9588-93.)

Rule 33 permits a court to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  To grant a Rule 33 motion, a trial judge "must harbor a real concern that an innocent person may have been convicted."  United States v. Guang, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks and citations omitted).  Here, for substantially the reasons outlined in the Government's opposition to this motion, the Court is persuaded that there was ample evidence introduced at trial to support these convictions.  The Government introduced evidence, inter alia, that Bonventre failed to report approximately $4.5 million in gross income from 1992 through 2008, including approximately $1,915,563.51 in direct payments by Madoff Securities on Bonventre's behalf for personal expenses such as his country club dues, his son's tuition, and parking and common charges in connection with his apartment in New York (see GX 500-26 to 500-32, 2000-35 and 2000-52); that Bonventre or his family members received $1,642,653.49 in wire transfers and checks from Madoff Securities, which were not denominated as a salary or bonus (see GX 2000-35

through 2000-54, see also Gov. Opp. at 105); and that Bonventre told Friehling that he accounted for the money that Madoff paid for his apartment on his tax returns when Bonventre never actually did so (Tr. 2928-30, GX 500-63).

When Bonventre testified, he admitted that he had not reported certain income that he should have.  (Tr. 9694.)  Furthermore, in proffering that he had believed Madoff's promise to take care of gift taxes, Bonventre implicitly acknowledged that he had known he could not receive those benefits without triggering some tax obligation.  (See, e.g., Tr. 9674 ("Q.  When Mr. Madoff gifted things to you, what was your understanding of the tax consequences of receiving the gift?  What was your understanding at the time?  A.  There was an allowable gift amount and anything over that, he told me that he would file a gift tax return when he filed his income tax.").)  The evidence also showed that, in addition to filing his own false personal tax returns, Bonventre provided false books and records in support of Madoff's tax audits (see Tr. 2878-79, 2923, 2983-85) and that he knew that he was providing false documents and did so to deceive auditors, as he created a second set of books that changed preexisting general ledger entries so as to achieve Bernard Madoff's tax liability goals. (See GX 105-a127 and GX 900-53b; see also Tr. 2988-89.)  This evidence was more than sufficient to support the inferences required to determine that Bonventre's tax crimes were knowing and willful.  Accordingly, the Court denies Bonventre's Rule 33 with respect to Counts Four and Twenty to Twenty-Four.

3.    Crupi's Rule 33 Motion

a.    *Crupi's Rule 33 Motion: Counts One, Two, Six, Seven, Nine, Ten, Twelve,*
      *Thirteen, Sixteen, Seventeen and Thirty-One to Thirty-Three*

Crupi argues that her convictions on the securities fraud counts, the bank fraud counts and the tax evasion counts are against the weight of the evidence, constituting a manifest injustice,

and that she should be granted a new trial on these counts.  Crupi's arguments in support of her Rule

33 motion are substantially the same as those raised on her Rule 29 motion.  As to the securities

fraud counts, she argues that the evidence showed only that she tracked the balance of the Chase

'703 account and that the Government relied on her proximity to DiPascali in the office and his

testimony to connect her to the crimes charged in these counts, while DiPascali was not a credible

witness.  As to her bank fraud and tax evasion convictions, Crupi again relies on the arguments in

her previously submitted Rule 29 motions, namely, that the Government did not show that she

intended to deceive and cause actual harm for the bank fraud counts and that there was no evidence

that she evaded taxes on the other counts.

       "Because the courts generally must defer to the jury's resolution of conflicting

evidence and assessment of witness credibility, [i]t is only where exceptional circumstances can be

demonstrated that the trial judge may intrude upon the jury function of credibility assessment."

United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted).

Crupi argues that DiPascali's testimony was patently incredible because he was a convicted perjurer

and that he lied during his testimony just as he had lied to the SEC investors and everyone else.[18]

While DiPascali admitted that he lied in the past, the Court does not find that his testimony over the

---

[18]    In support of this contention, Crupi points to DiPascali's testimony that there was
a specific sentence in a document that allowed him to determine that the
document had been created in 2005 and that Crupi had helped Madoff cut and
paste new signature blocks onto the altered document (Tr. 5201-11).  Defense
counsel later pointed out that the supposedly telltale language had also appeared
in a January 2004 document and that the alterations to the 2005 document were in
DiPascali's own hand.  (See Crupi Rule 33 Mem. at 29-30.)  Although Crupi
admits she cannot show that DiPascali's other testimony was false, she argues
that it strains credulity and was called into question by other witnesses like Craig
Kugel.  (Id. at 30.)  The jury, to which defense counsel argued the contradictions
in the evidence, nonetheless credited DiPascali's testimony at least in part, as it
was entitled to do.  (See Jury Instructions at 15, docket entry no. 773.)

course of nearly a month at this trial was so patently incredible as to rise to the level of exceptional circumstances warranting setting aside the verdict and granting a new trial.  Moreover, given the strength of the evidence presented in the Government's case against Crupi during trial, the Court is not left with a "real concern that an innocent person may have been convicted."  Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).  For these reasons, the Court finds that there is sufficient evidence to sustain Crupi's convictions on these counts and denies her Rule 33 motion for a new trial.

### 4.   O'Hara's Rule 33 Motion

O'Hara argues that the jury's verdict is not supported by satisfactory and sufficient evidence.  According to O'Hara, he was lied to and deceived by Madoff and DiPascali, he did not have the training to recognize that what was going on was wrong, and he should be granted a new trial, as there is a real concern here that "an innocent person was convicted."  Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).  O'Hara further asserts that he believed that the trading in the IA business was real and argues that the mere fact that he was involved in writing computer code does not weigh in favor of his guilt because other employees, who were not charged with any crimes, were also involved in writing that code.  O'Hara also argues that all of the testimony regarding O'Hara's culpability derived from DiPascali, who is a convicted perjurer.  Finally, O'Hara contends that the spillover prejudice from being tried with the other Defendants and with Perez, who purportedly confessed to Cohen, deprived him of a fair trial.[19]

_____

[19]   O'Hara also argues in the Rule 33 portion of his briefing that there was no meaningful victim testimony from individuals or institutions at trial, as JPMorgan Chase signed a Deferred Prosecution Agreement with the U.S. Attorney's Office, which indicates that it played an extensive role in allowing Madoff's Ponzi scheme to flourish and cannot legitimately be viewed as a "victim" in connection

These are essentially the same arguments that O'Hara makes in the portion of his brief devoted to his Rule 29 motion.  As for DiPascali's purported propensity to lie and general lack of credibility, the Defendants highlighted the inconsistencies in DiPascali's testimony and the fact that he had lied under oath multiple times during the trial and appropriate instructions were given. "Though a district court is entitled to weigh the evidence and in doing so evaluate for itself the credibility of the witnesses [under Rule 33], . . . it must . . . not wholly usurp[ ] the role of the jury." United States v. Triumph Capital Group, 544 F.3d 149, 159 (2d Cir. 2008) (quotations, alterations and citations omitted).  With regard to his spillover prejudice argument in this motion, he has not proffered any evidence that he was prejudiced by being tried with the other Defendants other than his own speculation.  The Court had denied O'Hara's pretrial severance motion and, mindful of the issues attendant to multi-defendant trials, repeatedly instructed the jury on its obligation to consider separately the evidence as to each charge against each Defendant.

O'Hara offers one way to interpret the evidence presented at trial and he makes many of the same arguments now regarding the conclusions to draw from the evidence and testimony presented that his able counsel made during the trial.  However, the jury was permitted to draw its own inferences and make its own credibility determinations.  The Court finds that there was sufficient reliable evidence to support the jury's determination of guilt on these counts.  For

---

with Madoff's fraud, and the only individual victim that the Government called actually gained money from the investments he placed with Madoff Securities. (See O'Hara Reply at 41-44.)  The fact that JPMorgan Chase signed a Deferred Prosecution Agreement does not negate that bank's victim status with respect to false loan applications.  Although William Wallman actually gained money overall, the statements he received from Madoff Securities were false and, as he testified, led him to believe that he had money that was not actually in his accounts.  (See, e.g.,Tr. 3318.)  Moreover, even if neither William Wallman nor JPMorgan Chase were to qualify as a victim, there was sufficient testimony at trial regarding investors who lost money from the fraud to establish that there were victims of the crimes of which Defendants were convicted.

substantially the reasons stated in the Government's opposition papers (see pages 23-66, 75) and in

the section of this Opinion addressing O'Hara's Rule 29 motion, the Court denies O'Hara's Rule 33

motion.


5.      Perez's Rule 33 Motion

Perez moves for a new trial under Rule 33, on Counts One, Six, Nine and Twelve,

and on Counts Two, Seven, Ten and Thirteen.  Like O'Hara, Perez argues that, once the Court

considers the credibility of the witnesses who testified against him, the evidence of his guilt on these

counts preponderates in his favor, leaving the risk of a grave miscarriage of justice.  The Court has

already discussed why there was sufficient evidence to find Perez guilty beyond a reasonable doubt

on Counts One, Six, Nine and Twelve in the portion of this Opinion responding to Perez's Rule 29

motion and, even under Rule 33's more discretionary standard, the Court finds that there was

sufficient, reliable and credible information to support his convictions.

As for Counts Two, Seven, Ten and Thirteen, which all relate to Perez's alleged

participation in the creation of false documents for the SEC and KPMG audits, Perez contends that

the Government did not introduce evidence demonstrating that Perez had the intent required to be

found guilty of these crimes.  With regard to the allegation that Perez created programs generating

conflicting versions of books and records containing randomized data, he argues that he was lied to

by DiPascali about the reason that these records were being created (see, e.g., Tr. 5668, 7013) and

that he was never shown the document requests from the auditors; never had any contact with the

auditors; never played any role in selecting what data was given to the auditors; and was never told

what records were actually given to any of the auditors.  Perez also argues that the most

incriminating allegations against him were made by DiPascali and Cohen, who were not credible witnesses.

"Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." McCourty, 562 F.3d at 475-76 (internal alterations, quotations and citation omitted). "An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, and the district court's identification of problematic testimony does not automatically meet this standard." Id. (internal quotation marks and citations omitted). Neither DiPascali nor Cohen's testimony rises to the level of "patently incredible," and Perez has not shown how this case presents an example of the exceptional circumstances that would justify a new trial. The jury's determination of the challenged witnesses' credibility is entitled to deference and will not be disturbed by this Court. DiPascali and Cohen's testimony, combined with the other evidence presented at trial, as outlined in the Government's opposition to this motion (see pages 22-66, 75-76), constituted sufficient, credible and reliable testimony to support convictions on these counts. Accordingly, the branch of Perez's motion seeking a new trial pursuant to Rule 33 is also denied.

C.     Perez's Request for an Evidentiary Hearing Regarding Cohen's Testimony

Perez also argues, in the alternative, that the Court should hold an evidentiary hearing as to Cohen's testimony that Perez told him Madoff had given Perez money to perform work that he was uncomfortable doing and Perez had taken the money and performed the work, and that Cohen had advised Special Agent Keith Kelly ("Agent Kelly") and others at the time about Perez's purported confession. Perez argues that Cohen's testimony about Perez taking the money, which

came out at trial, was contrary to Cohen's April 2011 statement to investigators about what Perez told him, when Cohen was interviewed about this subject.[20]   Perez argues that the Court has the power to hold an evidentiary hearing in connection with a Rule 33 motion, citing United States v. Colon-Munoz, 318 F.3d 348, 358 (5th Cir. 2003), which describes how the "request for an evidentiary hearing is at the discretion of the trial court" but that a "defendant has no absolute or presumptive right to insist that the district court take testimony on every motion."

This issue has already been litigated extensively before this Court.  After Cohen's testimony, Perez's counsel attempted to impeach him through extensive cross-examination and then filed a motion arguing that the Government had withheld critical Brady/Giglio[21] material (docket entry no. 529).  On December 4, 2013, the Court denied Perez's motion, holding that Brady/Giglio was not a discovery doctrine that could be used to compel the Government to gather information for the defense, but cautioned that "[i]f any of the individuals to whom Mr. Cohen claims to have communicated the statement prior to trial has a definitive recollection that Mr. Cohen made no such disclosure, the impact on the jury's assessment of Mr. Cohen's credibility could conceivably be significant."  (See Dec. 4, 2013, Order, docket entry no. 558 at 4.)  The Government then spoke to Agent Kelly and reported that Agent Kelly had said his recollection was the same as Cohen's.  The

---

[20]     According to Perez, Cohen's contention that he immediately told Agent Kelly (and others) the inculpatory version of Perez's statement was belied by a number of facts including that: (1) that Agent Kelly made no written report of his conversation with Cohen despite FBI rules requiring him to do so; (2) the prosecution team that tried the case was unaware of the inculpatory version of the statement until approximately October 15, 2013; (3) there is no written record of anyone else from AlixPartners or FTI Consulting ever having been advised by Cohen of the inculpatory version of the statement; and (4) Cohen was not asked about the statement at the April 2011 interview, despite the presence of Special Agent Paul Takla, who took over as case agent from Agent Kelly.

[21]     See Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972).

Court also reviewed in camera the notes from this conversation and determined that there was nothing that warranted disclosure.  Perez did not call Special Agent Kelly in the defense case, but did call Special Agent Takla, who testified that Cohen did not relay the statement about doing the work for money (i.e., "I'll give you some money, just do it, and he did") in the April 2011 interview. (Tr. 10633-35, 10639.)

In light of all of the evidence presented at trial on this issue, the Court finds that the jury had a sufficient opportunity to evaluate Cohen's credibility thoroughly.  Moreover, as the Court has previously held, the statement that Cohen made at trial is not necessarily incompatible with what he reportedly said in April 2011 and, if Perez had wanted to show that there really was an inconsistency, he had ample opportunities during the trial during which he could have sought to take up this point and introduce more evidence.  Perez fails to identify evidence that was not available to him at trial, and the Court is not aware of any additional probative evidence that he could seek to adduce at the proposed evidentiary hearing.  "Where, as here, the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict, there is no need" to conduct an evidentiary hearing.  United States v. Stewart, 433 F.3d 273, 302 (2d Cir. 2006).  Accordingly, Perez's request for an evidentiary hearing is denied.

CONCLUSION

For the foregoing reasons, the Defendants' motions are denied in their entirety.

This Opinion and Order resolves docket entry numbers 719, 722, 767, 970, 974, 975, 979 and 1014.

The Clerk of Court is also requested to terminate docket entry numbers 645, 676, and 1007, which were previously resolved.

SO ORDERED.

Dated: New York, New York
       July 24, 2014

                                         /s/ Laura Taylor Swain
                                         LAURA TAYLOR SWAIN
                                         United States District Judge