THE LAW OFFICES OF
# Andrew J. Frisch

40 FULTON STREET
23rd FLOOR
NEW YORK, NEW YORK 10038

(212) 285-8000
FAX: (646) 304-0352

WWW.ANDREWFRISCH.COM

October 6, 2014

The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    United States v. Daniel Bonventre
                Criminal Docket No. 10-228 (LTS)

Dear Judge Swain:

      We submit this letter on behalf of Mr. Bonventre pursuant to the Court's order of October 2, 2014, as a further submission on the issue of forfeiture.

      The government has yet to establish that pieces of evidence from decades ago constitute a preponderance of the evidence of Mr. Bonventre's knowledge or conscious avoidance at those remote points in time. If the government is correct that each defendant had "evolving knowledge" of the fraud [Gov't Supp Reply at 5], the historical pieces relied on by the government (if they truly happened at all, or as characterized by the government) at worst contributed to that evolution, but do not themselves constitute the preponderance of evidence of knowledge or conscious avoidance at the particular remote points in time trumpeted by the government. Instead, the government unfairly invites the Court to infer knowledge or conscious avoidance at remote points in time from evidence of events decades later. *See, e.g.,* Gov't Supp Reply at 8-9 (conflating Mr. Bonventre's maintenance of the firm's general ledger after about 2000 with his earlier role in making entries in it). More, the government steadfastly refuses to acknowledge that these defendants worked for a psychopath of unprecedented depravity who used his standing as a revered icon and as their boss to mislead them. If the fact of Bernard Madoff's deceit is not a bar to Mr. Bonventre's criminal liability, nor is it irrelevant to determining when Mr. Bonventre had been exposed to a sufficient number of suspicious circumstances to justify a finding of his knowledge or conscious avoidance. The government's over-aggressive posture on this issue, all but suggesting Mr. Bonventre's full knowledge of all aspects of Mr. Madoff's fraud at every point in time, does not establish the fact of Mr.

Bonventre's knowledge or conscious avoidance before the Bonventres completed the purchase of their home in 1992.

   The government's reliance on replication of DTC reports demonstrates the overstatement of the government's position. In claiming Mr. Bonventre's knowledge or conscious avoidance before 1992, the government relies on Enrica Cotellessa-Pitz's testimony that Mr. Bonventre was involved with Madoff Securities programmer Ken Hutchenson to replicate DTC reports. *See* Gov't Supp Reply at 7 (citing Tr. 3723). The government's theory is that Mr. Bonventre was the person at Madoff Securities most familiar with DTC reports based on his work with DTC in the broker-dealer business. But when Mr. Madoff sought to replicate the reports, it was exclusively Frank DiPascali who dealt with Kenneth Hutchenson, a Madoff Securities programmer. As Mr. Hutchenson told the government on January 20, 2010:

> Hutchenson did not know why he was tasked with the DTC project. Hutchenson felt that information was very compartmentalized at BLMIS and he was told only enough information to do his job. DiPascali and [Liz] Weintraub did not tell Hutchenson what the DTC report was or why he was asked to create it . . . .
>
> Hutchenson could not recall if DiPascali gave him anything to use or copy to create the DTC report. Hutchenson only remembered giving printouts to DiPasccali to mark up with changes. Hutchenson remembered DiPascali getting angry because the box lines did not line up with the green/white bars on the paper.
>
> Hutchenson may have bounced ideas off of other employees, but could not recall who he talked to regrading [sic] the DTC report. Hutchenson could not recall if he ever showed a DTC printout to Enrica Cotellessa-Pitz. *Hutchenson only dealt with DiPascali regarding the DTC project.*

3517-2 at 2 (emphasis added). Hutchenson's exclusive dealings with Mr. DiPascali in replicating DTC reports does not necessarily refute the government's theory that Mr. Bonventre's awareness of or participation in the project contributed to his accumulated knowledge of the fraud *at some point*. But the fact that Mr. Hutchenson dealt exclusively with Mr. DiPascali, and not Mr. Bonventre who was more familiar with DTC reports from his work in the broker-dealer business, further proves that the purpose of the project was not immediately disclosed to Mr. Bonventre (if ever), nor was the import to him immediately clear, assuming it ever was. If Mr. Bonventre was the full-fledged member of the fraud as the government claims, he would have been in the best position to direct Mr. Hutchenson. On this point, the government ignores the following *exculpatory* testimony from Ms. Cotellessa-Pitz:

> Q. Among the things that you have testified to this jury are the following. In the 1990s you were aware of an attempt to fabricate DTC reports, is that right?
>
> A. I didn't know if was a fabrication. I thought it was a reproduction.

Tr. 4009.

In assessing the timing and import of CP adjustments, Ms. Cotellessa-Pitz testified at trial that she first became aware of them in 1997 or 1998 (well after the early 1990s). Tr. 3731, 4039. She told the government that she considered the adjustments to be unusual, but that she saw nothing wrong with them:

> When ECP first took over her responsibilities from Irwin Lipkin in approximately 1997 or 1998, she became aware of other monies being moved between the 17th and 18th floors in the form of monthly loans. Loans from the 17th floor to the 18th floor were used to bolster the P&L for the market-making and proprietary trading businesses. If there was too much profit being shown on the 18th floor, loans were made to the 17th floor. ECP's understanding was that Madoff could move money between his businesses as he desired. ECP did not think Madoff was trying to "fudge the books".

3502-12 at 2.

The timing of the knowledge or conscious avoidance of all of the defendants in this case is difficult to fix because of an unprecedented confluence of factors, any one of which might be explained away by the government to justify a finding of early knowledge, but all of which, to borrow from the government, point at worst to an "evolving knowledge." Gov't Supp Reply at 5. Those factors include Mr. Madoff's psychopathy, his use of his standing and reputation to establish his ostensible legitimacy, and the defendants' roles as functionaries (as opposed, for example, to Peter Madoff, a lawyer and compliance officer, and Mr. DiPascali, Mr. Madoff's lieutenant, whom Mr. Madoff asked to lie and commit perjury to regulators). If there are defendants in other cases who can fairly be cast as Jekyll-and-Hydes based on selfless devotion to family at home but larcenous scoundrels at work, neither Mr. Bonventre nor any of the other defendants can fairly be so characterized here. On forfeiture as with liability, the government seeks to ascribe the most pervasive and evil state of mind to Mr. Bonventre, but the facts and reality are to the contrary, and do not establish a guilty state of mind so early.

Respectfully submitted,

/s/
Andrew J. Frisch

cc: All Counsel